## EXHIBIT A

### Motion

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                                          :
In re                                     :    **Chapter 11**
                                          :
**CANO HEALTH, INC.,** *et al.,*          :    **Case No. 24 – 10164 (KBO)**
                                          :
        Debtors.[1]                       :    **(Joint Administration Requested)**
                                          :
---------------------------------------------------------- x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014 FOR (I) AUTHORITY (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT ADEQUATE PROTECTION, (D) MODIFY THE AUTOMATIC STAY, AND (E) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF**

Cano Health, Inc. and certain of its subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, respectfully represent as follows:

**Preliminary Statement**

1.      By this motion (the "**Motion**"), the Debtors seek authorization to obtain postpetition financing (the "**DIP Financing**") and approval of their entry into a superpriority senior secured multiple draw debtor-in-possession term loan credit facility (the "**DIP Facility**") in an aggregate principal amount of $150 million, provided by the several financial institutions or other entities from time to time party thereto as "Lenders" (in such capacity, the "**DIP Lenders**"), and agented by Wilmington Savings Fund Society, FSB (in such capacity, the "**DIP Agent**" and

---

[1]     The last four digits of Cano Health, Inc.'s tax identification number are 4224. A complete list of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/CanoHealth. The Debtors' mailing address is 9725 NW 117th Avenue, Miami, Florida 33178.

together with the DIP Lenders, the "**DIP Secured Parties**") for and on behalf of itself and the other lenders party thereto with an initial draw of $50 million. Members of the Ad Hoc First Lien Group (as defined below) (the "**DIP Backstop Parties**") have also committed to backstop the DIP Facility in exchange for receiving certain fees, as discussed below. The Debtors also seek authorization to use cash collateral.

2. As described herein, the DIP Financing and use of cash collateral will provide the Debtors with the necessary liquidity to continue operating their healthcare and wellness business, on reasonable terms and with customary covenants. This financing is critical for the Debtors to continue operating their business, provide high quality medical care to their patients, preserve more than one thousand jobs, and finance these chapter 11 cases to complete their operational turnaround, and engage in a value-maximizing transaction. In support of this Motion, the Debtors submit the following:

- *Declaration of Drew Talarico in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 and Fed. R. Bank. P. 2002, 4001, 6003, 6004, and 9014 for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief*, sworn to the date hereof (the "**Talarico Declaration**"), which has been filed contemporaneously herewith and is annexed hereto as **Exhibit A**; and

- *Declaration of Mark Kent in Support of Debtors' Chapter 11 Petitions* (the "**Kent Declaration**"), which has been filed with the Court and is incorporated by reference herein.

3. The Debtors' initial budget (the "**Initial DIP Budget**" and, any budget thereafter, a "**Budget**") reflecting the anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date (as defined below) through and including the end of the thirteenth week following the Petition Date is annexed hereto as **Exhibit B** to the Interim Order.

4.      As of the Petition Date, the Debtors have a little over $2 million in cash on hand and thus require immediate access to the DIP Financing and authority to use cash collateral to ensure that they have sufficient liquidity to operate their healthcare business and continue delivering high-quality health care services to their patients.  The DIP Lenders have committed to provide the Debtors with DIP Financing in an aggregate amount of $150 million to finance these chapter 11 cases and allow the Debtors to pursue the restructuring transactions contemplated under the Restructuring Support Agreement (as defined below) for the benefit of all creditors.

5.      Several reasons justify the relief requested herein:

- The Debtors are entering chapter 11 with limited cash on hand.  Immediate access to DIP Financing is therefore critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently and safely operate their business during the pendency of these chapter 11 cases.

- The Debtors' proposed interim draw of $50 million is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- Negotiations with the proposed DIP Lenders were conducted at arm's length and in good faith.  The Debtors believe the DIP Facility provides sufficient liquidity with customary budget restrictions, all at rates and fees that are within market under the circumstances.

- The Debtors believe alternative financing is not available to the Debtors in the marketplace on superior terms. Prepetition, the Debtors solicited potential financing from several sources, including from third-party lenders, from unsecured noteholders and from the Ad Hoc First Lien Group.  Only the Ad Hoc First Lien Group expressed willingness to provide debtor-in-possession financing.

- The Debtors expect their patients, health plan payors, vendors, physicians, and employees will be highly focused on whether these chapter 11 cases are appropriately funded to maximize the greatest possibility of success.

### Relief Requested

6.      By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 522 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), the Debtors request entry of (i) an order granting the relief requested herein on an interim basis, in the proposed form of order attached hereto as **Exhibit B** (the "**Interim Order**"), and (ii) pending a final hearing on the relief requested herein, an order granting the relief requested herein on a final basis (the "**Final Order**" and, together with the Interim Order, the "**Proposed Orders**"):

- authority for Cano Health, LLC, in its capacity as borrower (the "**DIP Borrower**"), to obtain postpetition financing, and for each of the other Debtors (the Debtors, other than the DIP Borrower, the "**DIP Guarantors**") to guarantee unconditionally, on a joint and several basis, the DIP Borrower's obligations pursuant to and in connection with such superpriority senior secured multiple draw term loan credit facility in the aggregate principal amount of $150 million, of which (i) an initial draw amount of $50 million (the "**Initial DIP Loans**") will be made available to be drawn in a single drawing upon entry of the Interim Order (as defined below) and satisfaction of the other applicable conditions set forth in the DIP Credit Agreement (as defined below), and (ii) an additional amount of up to $100 million (the "**Final Term Loans**" and, together with the Initial DIP Loans, the "**DIP Loans**") will be funded upon entry of the Final Order and made available upon satisfaction certain conditions;

- authority for the DIP Borrower and the DIP Guarantors to (a) enter into and perform under the DIP Credit Agreement (as defined below), a substantially final form of which is attached hereto as **Exhibit A** to the Interim Order, (b) enter into and perform under an Escrow Agreement (the "**Escrow Agreement**"), to be entered into among the DIP Borrower, the DIP Agent, and an escrow agent (the "**Escrow Agent**") and, the Escrow Agreement together with the DIP Credit Agreement, the Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith, including any fee letters or schedules executed in connection with the DIP Facility, the Escrow Agreement, and the Fronting Fee (as defined in the DIP Credit Agreement) and any guarantee and security documentation, collectively, the "**DIP Documents**"; and (c) perform such other and further acts as may be required in connection with the DIP Documents;

- authority for the Debtors to pay (a) the principal and interest payable under the DIP Documents, (b) premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, the Backstop Fee, Participation Fee, and Fronting Fee (each as defined herein), and (c) all reasonable and documented costs and expenses

as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained, all to the extent provided in, and in accordance with, the Interim Order and the other DIP Documents;

- granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below) to secure the DIP Loans, subject only to (x) the Fee Reserve Account and the Carve Out (as defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that, by operation of law or as permitted by the Prepetition Documents, are senior to the liens and/or security interests of the Prepetition Secured Parties as of the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "**Prior Senior Liens**");

- granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Fee Reserve Account and the Carve Out on the terms and conditions set forth in the Interim Order and in the other DIP Documents;

- granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any diminution in the value of such parties' respective interests in the Prepetition Collateral;

- authority to use cash collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code;

- approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties, including (a) adequate protection liens and superpriority claims; (b) payment of reasonable and documented fees and expenses; (c) the right to seek additional adequate protection; and (d) certain financial reporting requirements;

- modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Proposed Orders;

- waiving the Debtors' and the Debtors' estates' right to surcharge the DIP Collateral (as defined below) and, subject to entry of the Final Order, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

- providing for the "equities of the case" exception under Bankruptcy Code section 552(b) not to apply to the DIP Secured Parties, and subject to entry of the Final Order, the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable;

- waiver of any applicable stay to provide for immediate effectiveness of the Interim Order; and

- scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than thirty (30) days after Petition Date.

## **Background**

7.     Beginning on February 4, 2024 (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

8.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015-1.

9.     The Debtors, together with their non-debtor affiliates, are one of the largest independent primary care physician groups in the United States.  The Debtors commenced their chapter 11 cases on a prearranged basis with the support, pursuant to the terms of a restructuring support agreement (the "**Restructuring Support Agreement**"), of creditors holding approximately 86% of the Debtors' secured revolving and term loan debt and approximately 92% of the Debtors' senior unsecured notes (collectively, the "**Consenting Creditors**").  With the support of the Consenting Creditors, the Debtors are seeking to implement a comprehensive restructuring, which may be implemented through a chapter 11 plan or sale of substantially all of

the Debtors' assets.  The Debtors expect to file a chapter 11 plan and disclosure statement in short order, consistent with the terms of the Restructuring Support Agreement, and to efficiently and expeditiously proceed through these cases towards emergence.

10.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Kent Declaration and the Declaration of Clayton Gring in Support of the Debtors' First Day Relief (the "**Gring Declaration**" and, together with the Kent Declaration, the "**First Day Declarations**"), each filed contemporaneously herewith and incorporated by reference herein.

## Jurisdiction

11.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Concise Statements Regarding DIP Facility**
**Pursuant to Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001-2**[2]

13.    In accordance with Bankruptcy Rules 4001(b)–(d) and Local Bankruptcy Rule 4001-2(a), the below chart summarizes the significant terms of the proposed Interim Order and the DIP Documents.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
| --- | --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Cano Health, LLC, a Florida limited liability company | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors other than the DIP Borrower | Interim Order, Recitals |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Any party holding a Term Loan or Commitment from time to time. | DIP Credit Agreement Section 1.01 |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB, as administrative agent | DIP Credit Agreement Preamble |
| **DIP Facility**<br><br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(i)(A)<br><br>**Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(i)(A) | The DIP Facility consists of term loans (the "**DIP Term Loans**") in the aggregate principal amount of $150,000,000, comprised of (i) an initial draw amount of $50,000,000, which will be made available to be drawn in a single drawing upon entry of the Interim Order and satisfaction of the other applicable conditions set forth in the DIP Credit Agreement, and (ii) additional DIP Term Loans in the aggregate principal amount of up to $100,000,000. | DIP Credit Agreement Section 2.01 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as <u>Exhibit B</u> to the Interim Order. | Interim Order, Ex. B |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B), Local | <u>Interest Rate</u>: S + 1,100bps; ABR + 1,000bps<br><u>Default Interest</u>: 2.00% plus the rate otherwise applicable | DIP Credit Agreement Sections 1.01 and 2.12(c) |

---

[2]    The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement, the relevant DIP Documents, and/or the Interim Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Credit Agreement, the DIP Documents, or the Interim Order, the provisions of the Interim Order shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Credit Agreement, the DIP Documents, and/or the Interim Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001–2 herein.

| | | |
|---|---|---|
| Bankruptcy Rule 4001-2(a)(i)(B) | | |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rules 4001-2(a)(i)(B) | "**Backstop Fee**" of 7.5% of the aggregate principal amount of the DIP Facility paid-in-kind, to be added to the principal amount of the DIP Facility and fully earned upon entry of the Interim DIP Order.<br><br>"**Participation Fee**" of 15.0% of the aggregate principal amount of the DIP Facility, payable solely in equity of the reorganized Company equal to the Participation Fee (expressed in dollars) divided by 75% of the plan value to be fully earned upon entry of the Interim DIP Order and allocated to the DIP Lenders upon emergence; *provided* that, to the extent that a Wholeco Sale Transaction is consummated, the Participation Fee shall be payable in cash on such date rather that in equity of the reorganized Company. | DIP Credit Agreement Section 2.11(d) and 2.11(e); RSA Term Sheet |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B) | The earliest of (such date, the "**Maturity Date**"):<br>• the date that is 8 months after the closing date,<br>• the date on which all DIP Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with the DIP Credit Agreement, by operation of law or otherwise,<br>• the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor,<br>• the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since the closing date, constitutes a sale of all or substantially all of the assets of the Loan Parties and<br>• the effective date of any chapter 11 plan of reorganization. | DIP Credit Agreement Section 1.01 |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii), Local Bankruptcy Rules 4001-2(a)(i)(F) and 4001-2(a)(i)(G)<br><br>**Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | DIP Collateral:<br>• First priority liens on any Unencumbered Property, subject only to the Fee Reserve Account and the Carve Out;<br>• First Priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition liens, subject only to the Fee Reserve Account and the Carve Out;<br>• Security interest in and lien upon all prepetition and post-petition property of the Debtors that is encumbered by Prior Senior Liens, immediately junior to such Prior Senior Liens, subject only to the Fee Reserve Account and the Carve Out<br><br>DIP Superpriority Claims: Subject only to the Fee Reserve Account and the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates | Interim Order ¶¶ 6, 7 |
| **Use of DIP Proceeds** Bankruptcy Rules 4001(b)(1)(B)(ii) and 4001(c)(1)(B) | The Borrower shall use the proceeds of the Term Loans for working capital and general corporate purposes of the DIP Borrower and the other Debtors in accordance with the Approved Budget, including to (i) pay amounts due under the DIP Credit Agreement or in connection therewith, (ii) pay the fees, costs and expenses of the Administrative Agent and the Lender Professionals, (iii) pay fees and | DIP Credit Agreement, Section 5.11 |

| | expenses of professionals associated with the chapter 11 cases, and (iv) fund the Carve Out. | |
|---|---|---|
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B) | Following the Interim Order Entry Date, the Debtors shall maintain liquidity of not less than $20,000,000 as of the last business day of each calendar week. | DIP Credit Agreement Section 6.14 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(i)(M) | Events of default (including thresholds, qualifications, exceptions and grace periods) customary and usual for debtor-in-possession financings of this type, including, among other things: (i) failure to pay principal when due, (ii) failure to pay interest or other amounts within five business days after becoming due, (iii) inaccuracy of representations or warranties in any material respect when made, (iv) breach of covenants (subject to certain grace periods), (v) defaults under Loan Documents, (vi) failure to satisfy the Milestones, (vii) certain bankruptcy events, including (a) conversion of the Chapter 11 Cases to a chapter 7 liquidation, (b) dismissal of the Chapter 11 Cases, (c) appointment of trustee under chapter 11 of the Bankruptcy Code or an examiner (other than a fee examiner under section 1106(a)(3) and (4) of the Bankruptcy Code), and (d) certain other bankruptcy events that significantly and materially impact the Debtors' reorganization efforts. | DIP Credit Agreement Section 7.01 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) , Local Bankruptcy Rule 4001-2(a)(i)(H) | Compliance with the following "Milestones" (as defined in the DIP Credit Agreement): <br><br> • entry by the Bankruptcy Court of the Interim Order within 3 days following the Petition Date; <br> • by no later than 5:00 p.m. (Eastern Time) on the date that is 28 days after the Petition Date (the "**Initial IOI Deadline**"), the Borrower shall have obtained receipt of indications of interest ("**IOIs**") for a sale of substantially all of the assets of the Debtors (a "**WholeCo Transaction**"); <br> • entry by the Bankruptcy Court of the Final Order within 35 days following the Petition Date; <br> • entry by the Bankruptcy Court of an order approving the Disclosure Statement by the date that is no later than 90 days following the Petition Date; <br> • entry by the Bankruptcy Court of an order confirming an Acceptable Plan (as defined in the DIP Credit Agreement) that is consistent with the RSA no later than 125 days following the Petition Date; and <br> • the effective date of an Acceptable Plan no later than 140 days following the Petition Date (which date shall be extended by 45 days in the event an Acceptable Plan has not gone effective solely due to any healthcare-related regulatory approvals or any pending approval under the Hart-Scott-Rodino Act; *provided* that such date shall be no earlier than as agreed in the Restructuring Support Agreement (as such date may be extended thereunder). | DIP Credit Agreement Sections 1.01, 5.15 and 5.20 |
| **Carve Out** Bankruptcy Rule 4001(b)(1)(B)(iii) , Local Bankruptcy Rule 4001-2(a)(i)(F) | The "**Carve Out**" shall be comprised of: (i) all fees required to be paid to the Clerk of this Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) all reasonable fees and expenses up to $100,000 incurred | Interim Order ¶ 10 |

| | | |
|---|---|---|
| | by any patient care ombudsman appointed in these chapter 11 cases (the "**Ombudsman**"); (iv) all accrued and unpaid fees incurred or earned by (a) persons or firms retained (or proposed to be retained) by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (such persons or firms, the "**Debtor Professionals**"), (i) at any time before the date of the delivery of the Carve Out Trigger Notice, and without regard to whether such fees and expenses are provided for in the Approved DIP Budget, and (ii) at any time after the date of delivery of the Carve Out Trigger Notice in an aggregate amount not to exceed $4,750,000 (collectively, the "**Post-Trigger-Notice Carve Out Fee Cap**"). | |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | The "Challenge Period" is seventy-five (75) days following the date of entry of the Interim Order.<br><br>If, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) calendar days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); | Interim Order ¶ 12 |
| **Debtors' Stipulations Concerning the Validity, Enforceability, Priority, or Amount of Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations. Subject to the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors and all other parties in interest. | Interim Order ¶¶ E, 12 |
| **Waivers/ Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified solely to the extent necessary to (i) permit the DIP Agent to exercise remedies upon five business days' notice of an event of default and (ii) to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to (a) the DIP Lenders and the DIP Agent under the DIP Documents, (b) the Escrow Agent under the Escrow Agreement, and (c) the Backstop Fee, Participation Fee, and Fronting Fee (each as defined in the DIP Credit Agreement)) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility. | Interim Order ¶¶ 3(d), 11, 16 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement contains indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | DIP Credit Agreement Section 9.03 |
| **Cross-Collateralization** Local Bankruptcy Rule 4001-2(a)(i)(N) | Not applicable. | |

| | | |
|---|---|---|
| **Non-Consensual Priming Liens** Local Bankruptcy Rule 4001-2(a)(i)(P) | Not applicable. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | Not applicable. | |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Agent and the Prepetition Administrative Agents are authorized, but not required, under the Interim Order to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent or the Prepetition Administrative Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of the Interim Order. | Interim Order ¶ 24 |
| **Provision Limiting the Court's Power or Discretion to Enter Future Orders** Local Bankruptcy Rule 4001-2(a)(i)(C) | None. | |
| **Provision Providing for the Funding of Non-Debtor Affiliates** Local Bankruptcy Rule 4001-2(a)(i)(D) | The Borrower shall not, nor shall it permit any of its Subsidiaries to, enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any of their respective Affiliates on terms that are less favorable to the Borrower or such Subsidiary (which shall be deemed to include an Affiliated Practice Group for purposes of this restriction), as the case may be, than those that might be obtained at the time in a comparable arm's-length transaction from a Person that is not an Affiliate (as reasonably determined by the Borrower), subject to certain exceptions as set forth in the DIP Credit Agreement. Notwithstanding anything in the DIP Documents to the contrary, in no event shall any of the Debtors transfer any property to a non-Debtor affiliate without the consent of the Required DIP Lenders, except in the ordinary course of business or as authorized pursuant to an order of the Court. | DIP Credit Agreement Section 6.08; Interim Order ¶ 38 |

| **Joint Liability of Debtors**<br>Local Bankruptcy Rule 4001-2(a)(i)(J) | The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations in accordance with the terms of the Interim Order and the DIP Documents. | Interim Order ¶ 19(b) |
|---|---|---|
| **Section 506(c) and Section 552(b) Waivers**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(i)(V) and 4001-2(a)(i)(W) | Without prejudice to the rights of parties in interest to object to entry of the Final Order, in light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, a waiver of (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) the provisions of section 506(c) of the Bankruptcy Code. | Interim Order ¶ 17(b) |
| **Conditions to Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(i)(E) | The DIP Documents include conditions to closing, as well as conditions for a subsequent draw and withdrawals from an escrow account under the DIP Credit Agreement, that are customary and appropriate for similar debtor in possession financings of this type. | DIP Credit Agreement Sections 4.01, 4.02 and 4.03 |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br>Local Bankruptcy Rule 4001-2(a)(i)(U) | Subject to entry of the Final Order, liens are granted on proceeds or property recovered from Avoidance Actions (but not the Avoidance Actions themselves). | Interim Order ¶ 6 |
| **Waiver of Claims Against Secured Creditors**<br>Local Bankruptcy Rule 4001-2(a)(i)(Q)<br><br>**Release, Waivers or Limitation on any Claim or Cause of Action**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the Challenge Period, the stipulations, admissions, waivers, and releases contained in the Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (defined below) as of the Petition Date.<br><br>Subject to entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "**Related Parties**") and each of the Prepetition Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist | Interim Order ¶¶ 12 and 25 |

| | on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, as applicable, | |
|---|---|---|
| **Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | As adequate protection of interests in the Prepetition Collateral, the Prepetition Administrative Agents, for the benefit of themselves and the other Prepetition Secured Parties, are granted:<br><br>First Lien Adequate Protection Liens. Additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.<br><br>Adequate Protection Superpriority Claims.  To the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value, but junior to the Carve Out and the DIP Superpriority Claims.<br><br>First Lien Adequate Protection Payments. Payment of all reasonable and documented fees and expenses, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, of (i) the DIP Agent Advisors; (ii) Freshfields Bruckhaus Deringer US LLP, as counsel to the CS Prepetition Administrative Agent; (iii) Proskauer Rose LLP, as counsel to the Sidecar Prepetition Administrative Agent; and (iv) the DIP/First Lien Advisors. | Interim Order ¶ 8 |
| **Marshaling** Local Bankruptcy Rule 4001-2(a)(i)(X) | The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the Interim Order, the DIP Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary,<br><br>Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral. | Interim Order ¶ 35 |

**Prepetition Indebtedness**

14.     The Debtors' outstanding funded indebtedness is comprised of obligations incurred by the Debtors under (i) the Credit Suisse Revolving Credit Facility, (ii) the Credit Suisse Term Loan Facility, (iii) the Sidecar Credit Facility (each as defined herein), and (iv) senior unsecured notes in the aggregate principal amount of $300 million (the "**Senior Notes**").  Below is a summary of the Debtors' prepetition indebtedness impacted by the relief requested in this Motion.  As summarized in the following chart, as of the Petition Date, the Debtors' capital structure includes approximately $933.1 million in outstanding prepetition secured debt obligations in aggregate:

| Category of Debt | Amount Outstanding as of the Petition Date |
| --- | --- |
| **Secured Funded Debt** | |
| Credit Suisse Revolving Credit Facility | **$120 million** |
| Credit Suisse Term Loan Facility | **$631.5 million** |
| Sidecar Credit Facility | **$181.6 million** |
| **Total Secured Funded Debt** | **$933.1 million** |

A.     **Credit Suisse Credit Agreement**

15.     Certain of the Debtors are party to that certain Credit Agreement, dated as of November 23, 2020 (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Credit Suisse Credit Agreement**"), by and among Cano Health, LLC, a Florida limited liability company (the "**Prepetition Borrower**"), Primary Care (ITC) Intermediate Holdings, LLC ("**Holdings**"), the lenders and issuing banks from time to time party thereto (the "**First Lien Lenders**"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**First Lien Agent**" and, together with the First Lien Lenders, the "**First Lien Secured Parties**").  Pursuant to the Credit Suisse Credit Agreement, the First Lien Lenders agreed to provide the Prepetition Borrower with (i) a

senior secured term loan in an aggregate principal amount of $875 million (the "**Credit Suisse Term Loan**"), (ii) a delayed draw term loan in an aggregate principal amount of $175 million, and (iii) a revolving credit facility in a maximum aggregate available amount thereunder of $120 million (the "**Credit Suisse Revolving Credit Facility**").  The Credit Suisse Term Loan is scheduled to mature on November 23, 2027, and the Credit Suisse Revolving Credit Facility is scheduled to mature on November 23, 2025.

16.     As of the Petition Date, the Debtors owed $751.5 million under the Credit Suisse Credit Agreement, including $631.5 million under the Credit Suisse Term Loan and $120 million under the Credit Suisse Revolving Credit Facility.  Subject to the terms of the Intercreditor Agreement (as defined below), the obligations under the Credit Suisse Credit Agreement are secured by substantially all of the assets of the Prepetition Borrower and are guaranteed by substantially all of the other Debtors.

**B.      Side-Car Credit Agreement**

17.     Certain of the Debtors are party to that certain Credit Agreement, dated as of February 24, 2023 (as amended by that certain First Amendment to Credit Agreement, dated as of August 10, 2023, the "**Side-Car Credit Agreement**" and, together with the Credit Suisse Credit Agreement, the "**Prepetition Credit Agreements**"), by and among the Prepetition Borrower, Holdings , the lenders from time to time party thereto (the "**Side-Car Lenders**" and together with the First Lien Lenders, the "**Prepetition Lenders**"), and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "**Side-Car Agent**" and together with the First Lien Agent, the "**Agents**" and each an "**Agent**" and, the Side-Car Agent, together with the Side-Car Lenders and the other secured parties under the Side-Car Credit Agreement, the "**Side-Car Secured Parties**" and, the Side-Car Secured Parties together with the First Lien Secured Parties, the "**Prepetition Secured Parties**").

18.     Pursuant to the Side-Car Credit Agreement, the Side-Car Lenders agreed to provide the Prepetition Borrower with a term loan (the "**Side-Car Term Loan**") in an aggregate principal amount equal to $150 million.  The loans under the Side-Car Credit Agreement are scheduled to mature on November 23, 2027.  As of the Petition Date, the Debtors owed $181.6 million under the Side-Car Credit Agreement.  The obligations under the Side-Car Credit Agreement also are secured by substantially all of the Borrower's assets and are guaranteed by substantially all of the Debtors.  The liens securing the Credit Suisse Credit Agreement and the Side-Car Credit Agreement rank *pari passu* with each other and are each subject to the Intercreditor Agreement (as defined below).

19.     On August 10, 2023, the Prepetition Borrower, entered into an amendment to the Side-Car Credit Agreement (the "**2023 Side-Car Amendment**") pursuant to which, among other things, the Debtors would not be required to test compliance with the Side-Car Credit Agreement's financial covenant until the fiscal quarter ending September 30, 2024.  The 2023 Side-Car Amendment provided, among other modifications, that the Prepetition Borrower would formally pursue a comprehensive process in an effort to yield one or more offers for a sale of all or substantially all of the assets or businesses of the Prepetition Borrower and its subsidiaries, with a purchase price that included cash proceeds sufficient to pay the obligations under the Side-Car Credit Agreement, and would use its commercially reasonable efforts to promptly close such a transaction within certain specified time periods.

### C.     The Intercreditor Agreement

20.     The obligations under the Credit Suisse Credit Agreement and the obligations under the Side-Car Credit Agreement (together, the "**Pari Passu Obligations**") are secured by the same Prepetition Collateral.  Pursuant to the terms of that certain First Lien Intercreditor Agreement, dated as of February 24, 2023 (the "**Intercreditor Agreement**"), by and

among the First Lien Agent, the Side-Car Agent and Cano Health, LLC, the liens granted on the Prepetition Collateral rank *pari passu* with each other.

21.    The Intercreditor Agreement provides that in the case of a bankruptcy proceeding, the distribution of the proceeds of any sale, collection or other liquidation of the Prepetition Collateral shall be applied (i) first, to the payment in full in case of all amounts owing to each Agent (in each Agent's capacity as such) and (ii) second, to the payment in full in cash of the Pari Passu Obligations of a given Series (as defined in the Intercreditor Agreement) in accordance with the terms of the Secured Credit Documents.

### D.    Debtors' Immediate Need for DIP Financing

23.    The Debtors require immediate access to DIP Financing to (i) ensure sufficient working capital to operate their healthcare and wellness businesses, provide high-quality patient care, and administer their estates, (ii) allow for timely payment of administrative expenses, including payroll and professionals' fees, and (iii) provide positive reassurances to the Debtors' patients, physicians, health plan payors, vendors and other stakeholders that the Debtors' lenders support a successful reorganization.  The Debtors are entering chapter 11 with severely constrained liquidity.  Without additional financing and the ability to use cash collateral, the Debtors will lack the liquidity needed to continue operating their business, paying their employees, and providing the high quality care their patients seek.  Immediate access to the proceeds of the DIP Facility (as defined below) will help ensure the Debtors will have the funds they need to remain a going concern and to avoid immediate and irreparable harm to their estates.

24.    Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared an Initial DIP Budget outlining the Debtors' postpetition cash need in the initial thirteen weeks of the chapter 11 cases. The Debtors believe the Initial DIP Budget and DIP Financing will provide the Debtors with the

funds necessary to, among other things, make payroll and satisfy their other working capital and general corporate obligations, including essential payments to vendors, physician affiliate practices, and service providers.

### Debtors' Efforts to Obtain Postpetition Financing

25.     As explained in the Talarico Declaration, beginning around August 2023, the Debtors faced a liquidity crisis and an impending financial covenant default under their Side-Car Credit Agreement.  After resolving the impending financial covenant default, the Debtors and their restructuring advisors, including Houlihan, commenced a parallel-track process to explore a potential restructuring of the Debtors' secured and unsecured funded indebtedness and an M&A transaction with a strategic or other partner.  To generate additional liquidity, the Debtors also pursued several non-core asset sales.  In September 2023, the Debtors sold their senior-focused primary care centers in Texas and Nevada, which generated approximately $35.4 million in cash, paid at closing.

26.     By November 2023, it became clear that additional non-core asset sales were unlikely to materialize before the Debtors were to face a liquidity shortfall, and the Debtors determined they would likely require additional financing and a comprehensive restructuring in the near-term.  During this period, the Debtors determined that they previously utilized substantially all of their available covenant flexibility under their debt documents in connection with raising the Side-Car Term Loan, which severely restricted the Debtors' ability to obtain out-of-court financing without the consent of the two lenders under the Side-Car Term Loan.  Furthermore, upcoming covenant defaults under the Credit Suisse Agreement made it likely that consents for an out-of-court financing would also be required from a majority of those lenders.

27.     In early December 2023, the Debtors continued to seek additional financing to fund their operations while they evaluated potential restructuring options, including a potential

chapter 11 deleveraging.  At this time, Houlihan and the Debtors' advisors initiated discussions with the advisors to a majority of the Debtors' prepetition secured lenders around the terms of a potential restructuring.  As part of these efforts, in mid-December 2023, Houlihan approached the Ad Hoc First Lien Group to explore the lenders' interest in an out-of-court financing, which would have addressed the Debtors' near-term liquidity needs for a period of time.  Around this time, Houlihan also contacted three of the Debtors' largest holders of unsecured notes on an individual basis, some of whom were part of the Ad Hoc First Lien Group, to gauge their interest in providing out-of-court financing.

28.    Although the parties that Houlihan contacted declined to provide any out-of-court financing, in early January 2024, the Ad Hoc First Lien Group expressed willingness to provide DIP Financing in conjunction with a restructuring support agreement and chapter 11 process. The Debtors received a term sheet from the Ad Hoc First Lien Group outlining the terms of a potential chapter 11 restructuring and DIP Financing approximately a week and a half later. The Debtors, with the assistance of their advisors, negotiated with the Ad Hoc First Lien Group regarding its terms.

29.    Before the Petition Date, Houlihan also approached three third-party lenders to gauge their interest in providing DIP Financing on an unsecured or junior basis.  None of these parties were willing or able to provide DIP Financing to the Debtors on an unsecured or junior secured basis within the near-term time frame required.  The Debtors' situation presents difficulties to obtaining unsecured or junior DIP Financing, namely that (i) substantially all of the Debtors' assets are encumbered and subject to the Prepetition Liens, (ii) the Ad Hoc First Lien Group beneficially owns greater than 86% of the aggregate debt under the Prepetition Credit Agreements and previously communicated that it would be unwilling to have their Prepetition Liens primed,

and (iii) prior efforts to generate liquidity by obtaining bridge financing using certain of the

Debtors' assets had been unsuccessful.

30.      On or about February 4, 2024, the Debtors and their advisors finalized with

the Ad Hoc First Lien Group the terms of the restructuring term sheet and the proposed DIP

Facility.  The negotiations were conducted in good faith and at arm's length, as described in greater

detail below.  Throughout this process, the Debtors' management and advisors provided regular

updates to the Finance Committee on the status of discussions with the Ad Hoc First Lien Group.

### **Relief Requested Should Be Granted**

### A. **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

38.      The Court should authorize the Debtors, as an exercise of their sound

business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP

Facility, and continue using the cash collateral.  Section 364 of the Bankruptcy Code authorizes a

debtor to obtain secured or superpriority financing under certain circumstances discussed in detail

below.  Courts grant debtors considerable deference in acting in accordance with their business

judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit

does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*,

*In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always

defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters.,

Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at \*14 (Bankr. S.D.N.Y. June 16, 2008) (explaining

that courts defer to a debtor's business judgment "so long as a request for financing does not

'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in

interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that

approval of postpetition financing requires, among other things, an exercise of "sound and

reasonable business judgment"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

40.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances. *See* Hr'g Tr. at 734:23-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as

they once were previously); *Unsecured Creditors Comm. v. First Nat'l Bank & Tr. (In re Elingsen McLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization), *aff'd*, 834 F.2d 599 (6th Cir. 1987).  Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

41.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the Talarico Declaration, the DIP Financing is the best available option to the Debtors under the circumstances and is the product of arm's-length negotiations.  Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests.  Given the Debtors' current cash position, absent access to the proceeds of the DIP Financing, the only alternative path available is liquidation, which would be detrimental to all stakeholders.  The Debtors could not secure sufficient financing in the form of unsecured credit, as an administrative expense in exchange for the grant of a superpriority administrative expense claim, or without granting priming liens, and were not able

to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is being sought.

42.    Moreover, the DIP Financing facilitated the Debtors' entry into the Restructuring Support Agreement, which provides the Debtors with a pathway to a value-maximizing transaction. The DIP Credit Agreement also contemplates a conversion of the DIP Facility into a senior secured term loan facility upon the Debtors' exit from the chapter 11 cases under a Stand-Alone Restructuring Plan rather than requiring the DIP Facility to be repaid in full, in cash at emergence, which will help facilitate the Debtors' successful restructuring and emergence.  Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, is necessary to avoid immediate and irreparable harm, and is a reasonable exercise of the Debtors' business judgment.

**B.  Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

43.    The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above.  The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject
to a lien . . . .

11 U.S.C. § 364(c).

44.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n*

(*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Crouse Grp., Inc.*, 71 B.R. 544,

549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy

Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be

obtained).   "The statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable."  *In re Snowshoe Co.*, 789 F.2d, at 1088; *see also Pearl-*

*Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that

superpriority administrative expenses should be authorized where debtor could not obtain credit

as an administrative expense).  When few lenders are likely to be willing to extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such

an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see*

*also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior

priming lien because the debtor had made unsuccessful contact with other financial institutions in

the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding

that the fact that two national banks refused to grant unsecured loans was sufficient to support the

conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40

(approving financing facility and finding that debtor made reasonable efforts to satisfy the

requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

45.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

46.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).  As described above and in the Talarico Declaration, the Debtors do not believe alternative financing is presently available on an unsecured or administrative priority only basis.  Thus, the Debtors determined that the DIP Facility provided the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

47.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superiority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the prepetition secured parties support the priming or (b) the prepetition secured parties' interests in collateral are adequately protected.

48.     Most importantly, here, any priming is consensual.  The Prepetition Secured Parties support the priming of its Prepetition Collateral in exchange for an adequate protection package.  Further, the Debtors are not aware of any available financing on equal or better terms from the DIP Lender absent the granting of first priority liens on the Prepetition Collateral, to which the Prepetition Secured Parties were unwilling to consent.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

### C.  Interests of Prepetition Secured Parties Are Adequately Protected

49.     Parties with an interest in prepetition collateral are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *RTC v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*,

16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

50.    The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, to the extent of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, for any reasons provided for under the Bankruptcy Code.  The Debtors propose to grant the Prepetition Secured Parties certain adequate protection liens over the DIP Collateral and other adequate protection described herein, to the extent of any diminution in value of the Prepetition Collateral, in exchange for the Prepetition Secured Parties' support of the priming of their Prepetition Collateral.  Granting such adequate protection liens to the Prepetition Secured Parties to obtain their consent to the Debtors' use of the Prepetition Collateral as provided in the Interim Order and DIP Credit Agreement was a reasonable exercise of the Debtors' business judgment.  Following the Debtors' advisors' prepetition discussions with the Debtors' unsecured noteholders and certain third parties, I am not aware of any available financing on equal or better terms from a third party absent the granting of superpriority senior liens on the Prepetition Collateral to such third party, to which the Prepetition Secured Parties would be unwilling to consent.

51.     The adequate protection provided to the Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of its interests in the Prepetition Collateral.  The Debtors submit that its provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### D.  Carve Out Is Appropriate

52.     The liens granted pursuant to the DIP Facility, adequate protection claims, and the superpriority claims of the Prepetition Lender and the DIP Lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See, e.g., In re Sunlight Financial Holdings, Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); *In re Western Global Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); *In re Brooks Brothers Group, Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123)*; In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. March 20, 2018) (Docket No. 130); *In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (Docket No. 130); *In re Am. Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (Docket No. 248); *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (Docket No. 54).

53.     Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers because the services for which professionals may be paid in these cases is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective

rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of Prepetition Secured Parties' interests in the Prepetition Collateral.

### E. Debtors Should Be Authorized to Pay the Fees Due Under the DIP Documents

54.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, premiums and expenses under the DIP Facility (collectively, the "**DIP Fees**") to the DIP Lenders, DIP Agent, an escrow agent (the "**Escrow Agreement**"), and a fronting lender (the "**Fronting Lender**") in exchange for their providing, backstopping, agenting, fronting and/or arranging the DIP Facility, including the Backstop Fee, the Participation Fee, and the reasonable and documented fees and expenses of the legal and financial advisors to each of the Ad Hoc First Lien Group and the DIP Agent.  The following summarizes certain key economic terms the Debtors have agreed to in connection with the DIP Facility:

- **Interest Rate**: at the DIP Borrower's election and certain conditions set forth in the DIP Credit Agreement, the DIP Facility will accrue interest at either (i) Adjusted Term SOFR (as defined in the DIP Credit Agreement) + 1,100 basis points or (ii) Alternate Base Rate (as defined in the DIP Credit Agreement) + 1,000 basis points, in each case, on the outstanding principal amount under the DIP Facility (including amounts funded into escrow).

- **Backstop Fee**: in exchange for their commitment to backstop the DIP Facility, 7.5% backstop fee on entire $150 million DIP Facility and payable "in kind", to be added to the principal amount of the DIP Facility and fully earned for the benefit of the Backstop Parties upon entry of the Interim Order (the "**Backstop Fee**").

- **Participation Fee**: 15.0% of the DIP Facility payable solely in shares of Reorganized Equity in an aggregate amount equal to the Participation Fee (expressed in dollars) divided by 75.0% of the value of the Debtors under an Acceptable Plan, to be fully earned upon entry of the Interim Order and allocated to the DIP Lenders upon emergence; *provided* that, to the extent

that a Wholeco Sale Transaction is consummated, the Participation Fee shall be payable in cash on such date, rather than in Reorganized Equity.

- **Cost to Administer**:  In addition to the Interest Rate, Backstop Fee, Participation Fee, certain costs to administer the DIP Facility will be paid to the DIP Agent, Escrow Agent, and Fronting Lender (each as defined in the DIP Credit Agreement).

55.     As set forth in the Talarico Declaration, the terms of the DIP Documents, including the DIP Fees imposed thereunder, are fair and reasonable under these circumstances, are within the market for comparable debtor-in-possession financing, and were negotiated at arm's length.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing.  As set forth in the Talarico Declaration, the Debtors believe these economic terms are the best terms available and are fair and reasonable under the circumstances, particularly given (i) the trading price of the Debtors' prepetition secured and unsecured debt, (ii) that the Debtors' primary assets are its people and systems, rather than hard assets with a durable value to lend against as collateral, (iii) the DIP Fees will be primarily paid in kind or equity unless the business is sold, (iv) the terms are coupled with a conversion to a 5-year exit facility in the event a Stand-Alone Restructuring Plan is confirmed, thereby not requiring the Debtors to rapidly repay the DIP Financing in full in cash in the near term, and (v) the Debtors are in the midst of executing on a comprehensive Transformation Plan.  The terms of the DIP Financing also do not include any "rollup" of prepetition secured claims or other similar features.  Furthermore, participation in the DIP Facility is being made available and syndicated to all Prepetition Secured Parties after the entry of the Interim Order on a pro rata basis, such that Prepetition Secured Parties that wish to provide DIP Financing to the Debtors have the opportunity and the ability to share in the economics that go along with participation.

56.     Accordingly, the Debtors believe paying these fees in order to obtain the

DIP Financing is in the best interests of the Debtors' estates and seek approval of the terms of the

DIP Financing and authority to pay the DIP Fees.

**F.  DIP Lender Should Be Deemed Good Faith Lender Under Section 364(e)**

57.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or the grant of such liens is later reversed or modified

on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58.     Here, the Debtors believe the DIP Financing embodies the most favorable

terms on which the Debtors could obtain postpetition financing.  As described in the

Talarico Declaration, all negotiations of the DIP Documents with the DIP Lender were conducted

in good faith and at arms' length.  The terms and conditions of the DIP Documents are fair and

reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for

purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and

the DIP Documents and in accordance with the Budget (subject to permitted variances).  Further,

no consideration is being provided to any party to the DIP Documents other than as described

herein and in the Talarico Declaration.  Accordingly, the Court should find that the DIP Lender is

"good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP

Lender thus is entitled to all of the protections afforded by that section.

### G. Modification of Automatic Stay Is Warranted

59.     The relief requested herein contemplates a modification of the automatic

stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and

superpriority claims described above with respect to the DIP Lenders and the Prepetition Secured

Parties, as applicable, and to perform such acts as may be requested to assure the perfection and

priority of such security interests and liens; (b) permit the Debtors to incur all liabilities and

obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP

Documents, the DIP Facility, and the Interim Order, as applicable; and (c) authorize the Debtors

to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and

apply, payments made in accordance with the terms of the Interim Order and the DIP Documents.

60.     Stay modifications of this kind are ordinary and standard features of

postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the

present circumstances. *See, e.g.*, *In re Sunlight Financial Holdings, Inc.*, No. 23-11794 (MFW)

(Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); *In re Western Global Airlines, Inc.*, No. 23-

11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); *In re Brooks Brothers Group,*

*Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); *In re Exide Holdings,*

*Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123); *In re Checkout*

*Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. January 17, 2019) (Docket No. 222); *In re*

*Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) (Docket No. 184); *In re*

*NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) (Docket No. 85); *In re*

*Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (Docket No. 130); *In*

*re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (Docket No. 93).

## **Request for a Final Hearing**

61.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). The Debtors request a date which is no later than thirty (30) days after entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.

## **Bankruptcy Rule 4001(a)(3) Should Be Waived**

62.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

## **Bankruptcy Rule 6003(b) Has Been Satisfied**

63.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date. Fed. R. Bankr. P. 6003(b). As explained above and in the Kent Declaration and in the Talarico Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing. The Debtors have an immediate need for access to liquidity to, among other things,

continue the operation of their business, maintain important customer and vendor relationships, meet payroll, and satisfy working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Request for Bankruptcy Rule 6004(a) and (h) Waivers

64.     To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Talarico Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Notice

65.     Notice of this Motion will be provided to the following parties (each as defined in the First Day Declarations): (a) the Office of the United States Trustee for the District of Delaware (Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov) and Jon Lipshie, Esq. (Jon.Lipshie@usdoj.gov)); (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue Service; (d) the U.S. Securities and Exchange Commission; (e) the United States Attorney's Office for the District of Delaware; (f) Gibson, Dunn & Crutcher LLP, 200 Park Ave, New York, NY 10166 (Attn: Scott J. Greenberg, Esq. (SGreenberg@gibsondunn.com), Michael J. Cohen, Esq. (MCohen@gibsondunn.com) and Christina M. Brown, Esq. (christina.brown@gibsondunn.com)) and Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street #1700, Wilmington, Delaware

19801 (Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and James O'Neill, Esq. (joneill@pszjlaw.com)), counsel to the Ad Hoc First Lien Group; (g) ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor New York, NY 10019 (Attn: Jeffrey R. Gleit, Esq. (jeffrey.gleit@afslaw.com)), as counsel to the DIP Agent; (h) Freshfields Bruckhaus Deringer US LLP, 601 Lexington Avenue, New York, NY 10022 (Attn: Mark F. Liscio, Esq. (mark.liscio@freshfields.com) and Scott D Talmadge, Esq. (scott.talmadge@freshfields.com)), as counsel to the Agent under the Credit Suisse Credit Agreement; (i) Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, IL 60602 (Attn: Evan Palenschat, Esq. (EPalenschat@proskauer.com)), as counsel to the Agent under the Side-Car Credit Agreement; (j) U.S. Bank National Association, West Side Flats 60 Livingston Ave. EP-MN-WS3C Saint Paul, MN 55107 (Attn: Global Corporate Trust Services), the Indenture Trustee under the Senior Note Indenture; (k) the Banks; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Bankruptcy Rule 9013-1(m).

66.     The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  February 5, 2024
        Wilmington, Delaware

/s/ Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
920 North King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Email: collins@rlf.com
        merchant@rlf.com
        steele@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
Matthew P. Goren (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Emails: gary.holtzer@weil.com
        jessica.liou@weil.com
        matthew.goren@weil.com

*Proposed Attorneys for the Debtors*
*and the Debtors in Possession*

**<u>Exhibit A</u>**

**Talarico Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

----------------------------------------------------------- x
                                                            :
In re                                                       :     **Chapter 11**
                                                            :
**CANO HEALTH, INC.,** *et al.*,                            :     **Case No. 24 – 10164 (KBO)**
                                                            :
                               Debtors.[1]                  :     **(Joint Administration Requested)**
                                                            :
----------------------------------------------------------- x

**DECLARATION OF DREW TALARICO IN SUPPORT OF
MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364, 507, AND 552 AND FED. R. BANKR. P. 2002,
4001, 6003, 6004, AND 9014 FOR (I) AUTHORITY TO (A) OBTAIN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL,
(C) GRANT LIENS AND PROVIDE SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (C) GRANT ADEQUATE
PROTECTION, (D) MODIFY THE AUTOMATIC STAY,
AND (E) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF**

     I, Drew Talarico, pursuant to section 1746 of title 28 of the United States Code,

hereby declare under penalty of perjury that the following is true to the best of my knowledge

information, and belief:

     1.     I am a Managing Director in the Financial Restructuring Group at Houlihan

Lokey Capital, Inc. ("**Houlihan**"), an investment banking and financial advisory firm.  I am based

out of Houlihan's New York office, located at 245 Park Avenue, 20th Floor, New York, New

York 10167.  Houlihan is the proposed investment banker for Cano Health, Inc. and certain of its

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**").  Houlihan and its senior professionals have extensive experience

---

[1]    The last four digits of Cano Health, Inc.'s tax identification number are 4224.  A complete list of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/CanoHealth.  The Debtors' mailing address is 9725 NW 117th Avenue, Miami, Florida 33178.

with reorganizing and restructuring distressed companies, both out-of-court and in chapter 11 proceedings.

2.       I submit this declaration (the "**Declaration**") in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 and Fed. R. Bank. P. 2002, 4001, 6003, 6004, and 9014 for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (the "**Motion**").[2]

3.       Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by Houlihan employees working under my supervision, (iv) information provided to me by, or in discussions with, the members of the Debtors' management team or their other advisors, and (v) my opinion based upon my experience as a restructuring professional.  If called to testify, I could and would testify to each of the facts set forth herein.  I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional proposed to be retained by the Debtors in these chapter 11 cases.  I am authorized to submit this Declaration.

<u>**Background and Qualifications**</u>

4.       Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,500 professionals.  Houlihan is a leader in providing investment banking and financial advisory services to debtors, unsecured and secured

---

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to the respective terms in the Motion, the proposed interim order attached as <u>**Exhibit B**</u> thereto (the "**Interim Order**"), or the Kent Declaration (as defined herein).

creditors, acquirers, and other parties in interest involved with financially troubled companies. Houlihan has been retained to provide investment banking and financial advisory services in some of the largest restructurings in the United States, including, *In re MVK Farmco LLC,* Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 16, 2023); *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022); *In re Bristow Group Inc.,* Case No. 19-32713 (Bankr. S.D. Tex. May 11, 2019); *In re PHI, Inc.,* Case No. 19-30923 (Bankr. N.D. Tex. Mar 14, 2019); *In re Walter Investment Management Corporation*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corporation*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC* (a.k.a. Relativity Media), Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014); *In re Premier International Holdings Inc.* (a.k.a. Six Flags Theme Parks), Case No. 09-12019 (Bankr. D. Del. June 13, 2009); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Jan. 22, 2008); *In re Conseco Inc*, Case No. 02-49672 (Bankr. N.D. Ill. Dec. 17, 2002); *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

5.      I have approximately sixteen (16) years of investment banking experience, entirely in Houlihan's financial restructuring group.  Since joining Houlihan in 2007, I have

provided investment banking expertise and financing advice, including with respect to postpetition debtor-in-possession financing, to companies, lenders, and other parties-in-interest, related to companies both in and outside of chapter 11. Over the most recent several years, a selection of my company- or creditor-side engagements involving a company in chapter 11 included, among others, Seadrill Limited, Venator, Valaris, Noble Corporation and Roust Corp.

### Debtors' Need for DIP Facility

9. As further detailed in the *Declaration of Mark Kent in Support of Debtors' Chapter 11 Petitions* (the "**Kent Declaration**"), filed contemporaneously herewith, the Debtors require immediate access to postpetition debtor-in possession financing ("**DIP Financing**") and use of cash collateral to (i) ensure sufficient working capital to operate their healthcare and wellness businesses, provide high-quality patient care, and administer their estates, (ii) allow for timely payment of administrative expenses, including payroll and professionals' fees, and (iii) provide positive reassurances to the Debtors' patients, physicians, health plan payors, vendors and other stakeholders that the Debtors' lenders support a successful reorganization.

10. The Debtors are entering chapter 11 with severely constrained liquidity. Without additional financing, the Debtors will lack the liquidity needed to continue operating their business, paying their employees, and providing the high quality care their patients seek. Immediate access to the proceeds of the DIP Facility (as defined below) ensures the Debtors will have the funds they need to remain a going concern and avoid immediate and irreparable harm to their estates.

11. Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared an initial budget outlining the Debtors' postpetition expenditures in the initial thirteen weeks of the chapter 11 cases (the "**Initial DIP Budget**"). Under the proposed DIP Financing, the Debtors will gain critical

access to a superpriority senior secured multiple draw term loan facility (the "**DIP Facility**") in the aggregate principal amount of $150 million, consisting of an initial draw of $50 million, subject to entry of the Interim Order.  I have reviewed the Initial DIP Budget and believe the DIP Facility will provide the Debtors with the funds necessary to, among other things, make payroll and satisfy their other working capital and general corporate obligations, including essential payments to vendors, physician affiliate practices, and service providers.

### Prepetition Efforts to Obtain Financing

12.     Beginning around August 2023, the Debtors faced a liquidity crisis and an impending financial covenant default under their Side-Car Credit Agreement.[3]  After resolving the impending financial covenant default, the Debtors and their restructuring advisors, including Houlihan, commenced a parallel-track process to explore a potential restructuring of the Debtors' secured and unsecured funded indebtedness and an M&A transaction with a strategic or other partner.  To generate additional liquidity, the Debtors also pursued several non-core asset sales.  In September 2023, the Debtors sold their senior-focused primary care centers in Texas and Nevada, which generated approximately $35.4 million in cash, paid at closing.  By November 2023, it became clear that additional non-core asset sales were unlikely to materialize before the Debtors were to face a liquidity shortfall, and the Debtors determined they would likely require additional financing and a comprehensive restructuring in the near-term.  During this period, the Debtors determined that they previously utilized substantially all of their available covenant flexibility under their debt documents in connection with raising the Side-Car Term Loan, which severely restricted the Debtors' ability to obtain out-of-court financing without the consent of the two lenders under the Side-Car Term Loan. Furthermore, upcoming covenant defaults under the Credit

---

[3]     The Debtors' prepetition capital structure is described in detail in the Kent Declaration.

Suisse Agreement made it likely that consents for an out-of-court financing would also be required from a majority of those lenders.

13.     In early December 2023, the Debtors continued to seek additional financing to fund their operations while they evaluated potential restructuring options, including a potential chapter 11 deleveraging.  At this time, Houlihan and the Debtors' advisors initiated discussions with the advisors to a majority of the Debtors' prepetition secured lenders around the terms of a potential restructuring.  As part of these efforts, in mid-December 2023, Houlihan approached the Ad Hoc First Lien Group to explore the lenders' interest in an out-of-court financing, which would have addressed the Debtors' near-term liquidity needs for a period of time.  Around this time, Houlihan also contacted three of the Debtors' largest holders of unsecured notes on an individual basis, some of whom were part of the Ad Hoc First Lien Group, to gauge their interest in providing out-of-court financing.

14.     Although the parties that Houlihan contacted declined to provide any out-of-court financing, in early January 2024, the Ad Hoc First Lien Group expressed willingness to provide DIP Financing in conjunction with a comprehensive and holistic restructuring solution for the Debtors, potentially coupled with a restructuring support agreement and chapter 11 process. The Debtors received a term sheet from the Ad Hoc First Lien Group outlining the terms of a potential comprehensive chapter 11 restructuring and DIP Financing approximately a week and a half later.  The Debtors, with the assistance of its advisors, negotiated with the Ad Hoc First Lien Group regarding its terms.

15.     Before the Petition Date, Houlihan also approached three third-party lenders to gauge their interest in providing DIP Financing on an unsecured or junior basis.  None of these parties were willing or able to provide DIP Financing to the Debtors on an unsecured or junior

secured basis within the near term time-frame required.  The Debtors' situation presents difficulties to obtaining unsecured or junior DIP Financing, namely that (i) substantially all of the Debtors' assets are encumbered and subject to the Prepetition Liens, (ii) the Ad Hoc First Lien Group beneficially owns greater than 86% of the aggregate debt under the Prepetition Credit Agreements and previously communicated that it would be unwilling to have their Prepetition Liens primed, and (iii) prior efforts to generate liquidity by obtaining bridge financing using certain of the Debtors' assets had been unsuccessful.

16.     On or about February 4, 2024, the Debtors and their advisors finalized with the Ad Hoc First Lien Group the terms of the restructuring term sheet and the proposed DIP Facility.  The negotiations were conducted in good faith and at arm's length, as described in greater detail below.  Throughout this process, the Debtors' management and advisors provided regular updates to the Finance Committee on the status of discussions with the Ad Hoc First Lien Group.

### The Terms of the DIP Financing are Fair and Reasonable

17.     In my role as the Debtors' investment banker, I have been actively involved in the solicitation, review, and analysis of the proposals received from the Ad Hoc First Lien Group regarding DIP Financing, as well as the negotiation process.  The proposed DIP Facility will provide the Debtors with the necessary liquidity to continue operating their healthcare and wellness business, on reasonable terms and with customary covenants.  This financing is critical for the Debtors to continue operating their business, preserve more than one thousand jobs, and finance these chapter 11 cases to complete their operational turnaround and engage in a value-maximizing transaction.  I believe that the proposed DIP Facility will provide the financing needed to support the Debtors' chapter 11 cases, is fair and reasonable under the circumstances and is in the best interest of the Debtors' estates.

18. Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, premiums and expenses under the DIP Facility to the DIP Lenders, DIP Agent and a Fronting Lender (collectively, the "**DIP Fees**") in exchange for their providing, backstopping, agenting, fronting and/or arranging the DIP Facility, including the Backstop Fee, the Participation Fee, and the reasonable and documented fees and expenses of the legal and financial advisors to each of the Ad Hoc First Lien Group and the DIP Agent. The following summarizes certain key economic terms the Debtors have agreed to in connection with the DIP Facility:

- **Interest Rate**: at the DIP Borrower's election and certain conditions set forth in the DIP Credit Agreement, the DIP Facility will accrue interest at either (i) Adjusted Term SOFR (as defined in the DIP Credit Agreement) + 1,100 basis points or (ii) Alternate Base Rate (as defined in the DIP Credit Agreement) + 1,000 basis points, in each case, on the outstanding principal amount under the DIP Facility (including amounts funded into escrow).

- **Backstop Fee**: in exchange for their commitment to backstop the DIP Facility, 7.5% backstop fee on entire $150 million DIP Facility and payable "in kind", to be added to the principal amount of the DIP Facility and fully earned for the benefit of the Backstop Parties upon entry of the Interim Order.

- **Participation Fee**: 15.0% of the DIP Facility payable solely in shares of Reorganized Equity in an aggregate amount equal to the Participation Fee (expressed in dollars) divided by 75.0% of the value of the Debtors under an Acceptable Plan, to be fully earned upon entry of the Interim Order and allocated to the DIP Lenders upon emergence; *provided* that, to the extent that a Wholeco Sale Transaction is consummated, the Participation Fee shall be payable in cash on such date, rather than in Reorganized Equity.

- **Cost to Administer:** In addition to the fees and interest above, certain costs to administer the DIP Facility will be paid to the DIP Agent and Fronting Lender.

19. No consideration is being provided to any party to the DIP Documents other than as described herein and in the Motion.

20.     The fees, interest rate, and other economic terms of the DIP Facility, including the DIP Fees imposed thereunder, are fair and reasonable under these circumstances, are within the market for comparable debtor-in-possession financing, and were negotiated at arm's length.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing.  I believe these economic terms are the best terms available and are fair and reasonable under the circumstances, particularly given (i) the trading price of the Debtors' prepetition secured and unsecured debt, (ii) that the Debtors' primary assets are its people and systems, rather than hard assets with a durable value to lend against as collateral, (iii) the DIP Fees will be primarily paid in kind or equity unless the business is sold, (iv) the terms are coupled with a conversion to a 5-year exit facility in the event a Stand-Alone Restructuring Plan is confirmed, thereby not requiring the Debtors to rapidly repay the DIP Financing in full in cash in the near term, and (v) the Debtors are in the midst of executing on a comprehensive Transformation Plan. The terms of the DIP Financing also do not include any "rollup" of prepetition secured claims or other similar features. Furthermore, participation in the DIP Facility is being made available and syndicated to all Prepetition Secured Parties after the entry of the Interim Order on a pro rata basis, such that Prepetition Secured Parties that wish to provide DIP Financing to the Debtors have the opportunity and the ability to share in the economics that go along with participation. I believe that paying the DIP Fees to obtain the DIP Financing is in the best interests of the Debtors' estates.

21.     The DIP Financing also proposes to grant the Prepetition Secured Parties certain adequate protection liens over the DIP Collateral and other adequate protection described in the Motion, to the extent of any diminution in value of the Prepetition Collateral, in exchange for the Prepetition Secured Parties' support of the priming of their Prepetition Collateral.  Granting

such adequate protection liens to the Prepetition Secured Parties to obtain their consent to the Debtors' use of the Prepetition Collateral as provided in the Interim Order and DIP Credit Agreement was a reasonable exercise of the Debtors' business judgment.  Following Houlihan's prepetition discussions with the Debtors' unsecured noteholders and certain third parties, I am not aware of any available financing on equal or better terms from a third party absent the granting of superpriority senior liens on the Prepetition Collateral to such third party, to which the Prepetition Secured Parties would be unwilling to consent.  Further, I believe the adequate protection provided to the Prepetition Secured Parties, as described above, is consensual, fair and reasonable, and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.

22.     The selection of the DIP Lenders was fair and reasonable based on their ability to provide the requested financing on the terms provided and on the timeline needed to address the Debtors' imminent liquidity situation.  The Debtors and the DIP Lenders exchanged multiple proposals and, subsequently, multiple drafts of a DIP Credit Agreement outlining the terms of the proposed DIP Facility.  The Debtors also exchanged drafts of the Interim Order in connection with negotiating the terms of the DIP Financing.  These negotiations, which were extensive and conducted at arm's length, culminated in the execution of the DIP Credit Agreement with the DIP Lenders, the terms of which are detailed in the Motion.

23.     Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests.  Given the Debtors' current cash position and the nature of its businesses, absent access to the proceeds of the DIP Financing, the only alternative path available is liquidation, which would be detrimental to all stakeholders.  The Debtors could

not secure sufficient financing in the form of unsecured credit, as an administrative expense in exchange for the grant of a superpriority administrative expense claim, or without granting priming liens, and were not able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is being sought.  Moreover, the DIP Financing facilitated the Debtors' entry into the Restructuring Support Agreement, which provides the Debtors with a defined pathway to stability and a value-maximizing transaction. The DIP Credit Agreement also contemplates a conversion of the DIP Facility into a 5-year senior secured term loan facility, with interest partially payable-in-kind for the first two years, upon the Debtors' exit from the chapter 11 cases under a Stand-Alone Restructuring Plan rather than requiring the DIP Facility to be repaid in full, in cash at emergence, which will help facilitate the Debtors' successful restructuring and emergence. Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, is necessary to avoid immediate and irreparable harm, and is a reasonable exercise of the Debtors' business judgment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  February 5, 2024
New York, New York

*/s/  Drew  Talarico*

Drew Talarico
Managing Director
Houlihan Lokey Capital, Inc.

## Exhibit B

**Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------- x
                                          :
In re                                     :    Chapter 11
                                          :
CANO HEALTH, INC., et al.,                :    Case No. 24 – 10164 (KBO)
                                          :
        Debtors.¹                         :    (Jointly Administered)
                                          :
----------------------------------------------------------- x
```

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364, 507, AND 552 AND FED. R. BANKR. P. 2002,
4001, 6003, 6004, AND 9014 FOR (I) AUTHORITY TO (A) OBTAIN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL (C) GRANT
LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC
STAY, AND (F) SCHEDULE FINAL HEARING, AND (II)  RELATED RELIEF**

Upon the motion, dated February 5, 2024 (the "**Motion**")[2] of Cano Health, Inc. and its

subsidiaries, as debtors in possession (collectively, the "**Debtors**") in the above-captioned

chapter 11 cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title

11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1(b),

4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking entry of this

interim order (this "**Interim Order**"):

(i)     authorizing Cano Health, LLC, in its capacity as borrower (the "**DIP Borrower**"),
        to obtain postpetition financing, and for each of the other Debtors (the Debtors,
        other than the DIP Borrower, the "**DIP Guarantors**") to guarantee unconditionally,

---

[1]   A complete list of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' proposed
      claims and noticing agent at https://www.kccllc.net/CanoHealth.  The Debtors' mailing address is 9725 NW 117th
      Avenue, Miami, Florida 33178.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion
      or the DIP Credit Agreement (defined below), as applicable.

on a joint and several basis, the DIP Borrower's obligations pursuant to and in connection with such superpriority senior secured multiple draw term loan credit facility (the "**DIP Facility**") in the aggregate principal amount of $150,000,000 (the "**New Money Commitments**"), of which (i) an initial draw amount of up to $50,000,000 (the "**Initial DIP Loans**") will be made available to be drawn in a single drawing upon entry of this Interim Order and satisfaction of the other applicable conditions set forth in the DIP Credit Agreement (as defined below), and (ii) an additional amount of up to $100,000,000 (the "**Final Term Loans**" and, together with the Initial DIP Loans, the "**DIP Loans**") will be funded upon entry of the Final Order and made available upon satisfaction of the applicable conditions set forth in the DIP Credit Agreement attached hereto as **Exhibit A** and all other terms and conditions set forth in the other DIP Documents (defined below); and

(ii)    authorizing the DIP Borrower and the DIP Guarantors to (a) enter into and perform under that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of February [   ], 2024, among the DIP Borrower, the lenders party thereto (collectively in such capacities, the "**DIP Lenders**"), and Wilmington Savings Fund Society, FSB, as administrative agent, and collateral agent (in such capacities, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**") (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**DIP Credit Agreement**") and the other DIP Documents (defined below); (b) enter into and perform under that certain Escrow Agreement (the "**Escrow Agreement**"), among the DIP Borrower, the DIP Agent, and a designated escrow agent (the "**Escrow Agent**") (each of the foregoing, together with this Interim Order, the Final Order (defined below), and all agreements, documents, and instruments delivered or executed in connection therewith (including any fee letters or schedules executed in connection with the DIP Facility, the Escrow Agreement, and the Fronting Fee (as defined in the DIP Credit Agreement), and any guarantee and security documentation), collectively, the "**DIP Documents**"); and (c) perform such other and further acts as may be required in connection with the DIP Documents;

(iii)   authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral including Cash Collateral (defined below), in each case (x) solely in accordance with the Approved DIP Budget (defined below) (subject to any Permitted Variance (defined below) set forth herein and in the DIP Credit Agreement), and (y) to provide working capital for, and for other general corporate purposes of, the Debtors and certain of the Debtors' subsidiaries, including payment of any Adequate Protection Payments (defined below);

(iv)    granting adequate protection to the Prepetition Secured Parties  (defined below) to the extent of any Diminution in Value (defined below) of their interests in the Prepetition Collateral;

(v)     granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether

2

such property is presently owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (defined below) to secure the DIP Loans, subject only to the (x) the Fee Reserve Account and the Carve Out (defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that, by operation of law or as permitted by the Prepetition Documents, are senior to the liens and/or security interests of the Prepetition Secured Parties as of the Petition Date to the extent permitted by section 546(b) (the "**Prior Senior Liens**");

(vi)     granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Fee Reserve Account and the Carve Out on the terms and conditions set forth herein and in the other DIP Documents;

(vii)    waiving the Debtors' and the Debtors' estates' right to surcharge the DIP Collateral (defined below) and, subject to entry of the Final Order, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(viii)   providing for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to the DIP Secured Parties, and subject to entry of the Final Order, the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable;

(ix)     pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "**Interim Hearing**") on the Motion to consider entry of this Interim Order;

(x)      scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and the entry of a final order (the "**Final Order**"), and approving the form of notice with respect to the Final Hearing; and

(xi)     granting related relief.

The Court having considered the Motion, the exhibits thereto, the *Declaration of Mark Kent in Support of Debtors' Chapter 11 Petitions* (Docket No. __) (the "**Kent Declaration**"), the *Declaration of Clayton Gring in Support of the Debtors' First Day Relief* (Docket No. __) (the "**Gring Declaration**" and, together with the Kent Declaration, the "**First Day Declarations**"), the *Declaration of Drew Talarico in Support of Motion of Debtors Pursuant to*

*11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 and F. R. Bank. P. 2002, 4001, 6003, 6004, and 9014 for (I) Authority to (A) Obtain Postpetition Financing, (B) Grant Liens and Provide Superpriority Administrative Expense Status, (C) Grant Adequate Protection, (D) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (Docket No. __) (the "**Talarico Declaration**"); and due and proper notice of the Motion having been provided to the Notice Parties; and such notice has been provided in accordance with the Bankruptcy Rules and Local Bankruptcy Rules; and it appearing that no other or further notice of the interim relief granted herein need be provided; and the Court having held the Interim Hearing on _____ __, 2024 to consider the relief requested in the Motion on an interim basis; and upon the First Day Declarations, the Talarico Declaration, the record of the Interim Hearing; and all objections, reservations of rights, or other statements with respect to the relief requested in the Motion on an interim basis, if any, having been withdrawn, resolved, or overruled; and the Court having determined the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having noted the appearances of all parties in interest; and it appearing the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.      *Petition Date*.  Beginning on February 4, 2024 (the "**Petition Date**"), the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing these Cases.

B.      *Debtors in Possession*.   The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court may enter a final order consistent with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.      *Committee*.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee subsequently appointed, the "**Committee**").

E.      *Debtors' Stipulations*.  Subject only to the rights of parties in interest specifically set forth in Paragraph I.12 of this Interim Order (and subject to the limitations thereon contained

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

in such Paragraph or as otherwise provided in this Interim Order), the Debtors stipulate and agree that (Paragraphs E(i) through (vii) below, collectively, the "**Debtors' Stipulations**"):

(i)    <u>CS Prepetition Loans</u>.

(a)    *CS Prepetition Credit Agreement*.  The First Lien Lenders (defined below) provided loans (the "**CS Prepetition Loans**") in a total aggregate principal amount outstanding as of the Petition Date of $751,544,089 under that certain Credit Agreement, dated as of November 23, 2020, by and among Cano Health, LLC, a Florida limited liability company, in its capacity as borrower (the "**Prepetition CS Borrower**"), Primary Care (ITC) Intermediate Holdings, LLC, a Delaware limited liability company ("**Holdings**"), each of the lenders from time to time party thereto (collectively, the "**First Lien Lenders**"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**First Lien Agent**" and, together with the First Lien Lenders and the other Secured Parties (as defined in the Credit Suisse Credit Agreement), the "**CS Prepetition Secured Parties**") (such credit agreement, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Credit Suisse Credit Agreement**" and, together with the other "Loan Documents" (as defined in the Credit Suisse Credit Agreement), the "**CS Prepetition Loan Documents**").

(b)    *CS Prepetition Obligations*.  As of the Petition Date, the Prepetition CS Borrower and all of the guarantors under the Prepetition Credit Agreements (the "**Prepetition Loan Parties**") were jointly and severally indebted to the CS Prepetition Secured Parties pursuant to the CS Prepetition Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $751,544,089 on account of CS Prepetition Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs,

premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Credit Suisse Credit Agreement), in each case, owing under or in connection with the CS Prepetition Loan Documents (collectively, the "**CS Prepetition Obligations**").

(c)     _CS Prepetition Liens_.  In connection with the Credit Suisse Credit Agreement, certain of the Prepetition Loan Parties entered into the Collateral Documents (as defined in the Credit Suisse Credit Agreement, the "**CS Prepetition Security Documents**").  As set forth in the CS Prepetition Security Documents and the other CS Prepetition Loan Documents, the CS Prepetition Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens on (the "**CS Prepetition Liens**") all of the Collateral (as defined in the CS Prepetition Security Documents, the "**Prepetition Collateral**"), which consists of substantially all of each Prepetition Loan Party's assets.

(d)     _Validity, Perfection, and Priority of CS Prepetition Liens and CS Prepetition Obligations_.   Subject to Paragraph E(iii) of this Interim Order, each Debtor acknowledges and agrees that, in each case, as of the Petition Date:  (A) the CS Prepetition Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the CS Prepetition Liens are subject and subordinate only to Prior Senior Liens (if any); (C) the CS Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties; (D) the CS Prepetition Liens encumber all of the Prepetition Collateral; (E) the CS Prepetition Liens were granted to or for the benefit of the CS Prepetition Secured Parties for fair consideration and reasonably

equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the CS Prepetition Liens or CS Prepetition Obligations exist, and no portion of the CS Prepetition Liens or CS Prepetition Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the CS Prepetition Loans, the CS Prepetition Obligations, or the CS Prepetition Liens; and (H) the CS Prepetition Obligations constitute an allowed, secured claim within the meaning of section 502 and 506 of the Bankruptcy Code.

(ii)     <u>Side-Car Prepetition Loans</u>.

(a)     *<u>Side-Car Credit Agreement</u>*. The Side-Car Lenders (defined below) provided loans (the "**Side-Car Prepetition Loans**" and, together with the CS Prepetition Loans,

the "**Prepetition Loans**") in a total aggregate principal amount outstanding as of the Petition Date of $181,614,719, under that certain Credit Agreement dated as of February 24, 2023, by and among Cano Health, LLC, in its capacity as borrower (the "**Prepetition Side-Car Borrower**" and, its capacity as both Prepetition CS Borrower and Prepetition Side-Car Borrower, the "**Prepetition Borrower**"), Holdings, each of the lenders from time to time a party thereto (collectively, the "**Side-Car Lenders**" and, together with the First Lien Lenders, the "**Prepetition Lenders**"), and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "**Side-Car Agent**" and, together with the First Lien Agent, the "**Prepetition Administrative Agents**" and, the Side-Car Agent together with the Side-Car Prepetition Lenders and the other Secured Parties (as defined in the Side-Car Credit Agreement), the "**Side-Car Prepetition Secured Parties**" and, the Side-Car Prepetition Secured Parties together with the CS Prepetition Secured Parties, the "**Prepetition Secured Parties**") (such credit agreement, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Side-Car Credit Agreement**" and, such Side-Car Credit Agreement together the with Credit Suisse Credit Agreement, the "**Prepetition Credit Agreements**" and, the Side-Car Credit Agreement together with the other "Loan Documents" (as defined in the Side-Car Credit Agreement), the "**Side-Car Prepetition Loan Documents**" and, together with the CS Prepetition Loan Documents, the "**Prepetition Loan Documents**").

(b)    *Side-Car Prepetition Obligations*.    As of the Petition Date, the Prepetition Loan Parties were jointly and severally indebted to the Side-Car Prepetition Secured Parties pursuant to the Side-Car Prepetition Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $181,614,719 on account of Side-Car Prepetition Loans *plus* accrued and unpaid interest with respect thereto and

any additional fees, costs, premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing], and all other Obligations (as defined in the Side-Car Credit Agreement), in each case, owing under or in connection with the Side-Car Prepetition Loan Documents (collectively, the "**Side-Car Prepetition Obligations**" and, together with the CS Prepetition Obligations, the "**Prepetition Obligations**"); *provided* that, for purposes of this Interim Order only, the Applicable Premium (as defined in the Side-Car Credit Agreement) shall be as resolved in accordance with the RSA.

(c)     *Side-Car Loan Collateral*.  In connection with the Side-Car Credit Agreement, certain of the Prepetition Loan Parties entered into the Collateral Documents (as defined in the Side-Car Credit Agreement, the "**Side-Car Prepetition Security Documents**" and, together with the CS Prepetition Security Document, the "**Prepetition Security Documents**").  As set forth in the Side-Car Prepetition Security Documents and the other Side-Car Prepetition Loan Documents, the Side-Car Prepetition Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "**Side-Car Prepetition Liens**" and, together with the CS Prepetition Liens, the "**Prepetition Liens**") on all of the Prepetition Collateral.

(d)     *Validity, Perfection, and Priority of Side-Car Prepetition Liens and Side-Car Prepetition Obligations*.  Subject to Paragraph E(iii) of this Interim Order, each of the Debtors acknowledge and agree that, in each case, as of the Petition Date:  (A) the Side-Car Prepetition Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Side-Car Prepetition Liens are subject

10

and subordinate only to Prior Senior Liens (if any); (C) the Side-Car Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties; (D) the Side-Car Prepetition Liens encumber all of the Prepetition Collateral; (E) the Side-Car Prepetition Liens were granted to or for the benefit of the Side-Car Prepetition Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Side-Car Prepetition Liens or Side-Car Prepetition Obligations exist, and no portion of the Side-Car Prepetition Liens or Side-Car Prepetition Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Side-Car Prepetition Administrative Agent, the Side-Car Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Side-Car Prepetition Loan Documents, the Side-Car Prepetition Obligations, or the Side-Car Prepetition

11

Liens; and (H) the Side-Car Prepetition Obligations constitute an allowed, secured claim within the meaning of section 502 and 506 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, but subject to the RSA, the Debtors and the Side-Car Lenders reserve all rights with respect to any Applicable Premium (as defined in the Side-Car Credit Agreement).

(iii)    *Cash Collateral*.  All of the Debtors' cash, including, without limitation, all of the (a) cash proceeds of accounts receivable, (b) cash proceeds of the Prepetition Collateral, (c) cash proceeds of Excluded Assets (as defined in the Credit Agreement) (to the extent such cash proceeds would not otherwise constitute Excluded Assets), and (d) cash (i) in the Debtors' Deposit Accounts (as defined in the Credit Agreement) pledged pursuant to any Collateral Document as of the Petition Date or (ii) pursuant to Bankruptcy Code section 552(b), deposited into the Debtors' Deposit Accounts after the Petition Date, constitutes cash collateral of the Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a) (the "**Cash Collateral**").  Solely with respect to the Cash Collateral received before the Petition Date relating to the Prepetition Collateral, the Prepetition Secured Parties have legal, valid, binding, enforceable, and perfected security interests solely to the extent permitted under applicable law, and subject to the rights of all parties to challenge those perfected security interests.

(iv)    *Bank Accounts*.  The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "**Cash Management Order**").

(v)    *Intercreditor Provisions*.  The Prepetition Borrower, Holdings, each of the other Prepetition Loan Parties, the First Lien Agent, and the Side-Car Prepetition Administrative Agent are parties to the First Lien Intercreditor Agreement, dated as of February 24, 2023 (as

amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**").  Pursuant to the terms of the First Lien Intercreditor Agreement, the First Lien Agent is the Applicable Authorized Representative (as defined in the First Lien Intercreditor Agreement) as of the Petition Date, with respect to any Shared Collateral (as defined in the First Lien Intercreditor Agreement).  The First Lien Intercreditor Agreement is binding and enforceable against the parties thereto in accordance with its terms and shall not be deemed to be otherwise amended, altered, or modified by the terms of this Interim Order, unless expressly set forth herein.

(vi)    _No Control_.  As of the Petition Date, none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Documents, or the Prepetition Loan Documents.

(vii)    _Default_.  The Debtors are in default under the Prepetition Loan Documents as a result of these Cases, and an event of default has occurred under the Prepetition Loan Documents.

F.    _Findings Regarding the DIP Facility and Use of Cash Collateral_.

(i)    The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement) to, among other things, (A) permit the orderly continuation of their businesses; (B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors and certain subsidiaries thereof.  The ability of the

Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value and successful reorganization. The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Secured Parties the DIP Liens (defined below) and the DIP Superpriority Claims (defined below) under the terms and conditions set forth in this Interim Order and the other DIP Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code

section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted, or payments made, in each case, to the DIP Agent and/or the DIP Lenders and arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all of the rights, remedies, privileges, and benefits granted herein.

(iv)    *Adequate Protection*.  Each of the Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, and for any diminution in the in the value of such interests (each such diminution, a "**Diminution in Value**").

(v)    *Sections 506(c) and 552(b)*.  Without prejudice to the rights of parties in interest to object to entry of the Final Order, in light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Fee Reserve Account and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, a waiver of (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) the provisions of section 506(c) of the Bankruptcy Code.

(vi)    *Consent by Prepetition Administrative Agents*.    The Prepetition Administrative Agents (at the direction of the applicable Required Lenders (as defined in each of the Prepetition Credit Agreements)), on behalf of and for the benefit of each of the Prepetition Secured Parties, has consented to, conditioned upon the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and conditions set

forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order.

G.    _Good Cause Shown; Best Interest_.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.    _Notice_.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and the applicable Local Rules.

I.    _Arm's Length, Good Faith Negotiations_.  The terms of this Interim Order were negotiated in good faith and at arm's length between the Debtors and the Prepetition Secured Parties.  The Prepetition Secured Parties have acted in good faith and without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facility and use of Cash Collateral, including in respect of all of the terms of this Interim Order, all documents related thereto, and all transactions contemplated by the foregoing.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

16

IT IS HEREBY ORDERED THAT:

1.      <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.      <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)      The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Credit Agreement and otherwise acceptable to the DIP Agent (acting at the direction of the "Required Lenders" under and as defined in the DIP Credit Agreement (such lenders, the "**Required DIP Lenders**")) and the Required DIP Lenders.  Upon entry of this Interim Order and until execution and delivery of the DIP Credit Agreement and the other DIP Documents required to be delivered thereunder, the Debtors and the DIP Secured Parties shall be bound by (x) the terms and conditions and other provisions set forth in any executed DIP Documents (including the fee letters or schedules executed in connection with the DIP Facility, the Escrow Agreement, and the Fronting Fee), with

the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order and the executed DIP Documents (including the fee letters or letters executed in connection with the DIP Facility, the Escrow Agreement, and the Fronting Fee) shall govern and control the DIP Facility.  Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and the other DIP Documents shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Documents, subject to the terms and conditions set forth therein and in this Interim Order.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

(b)  Upon entry of this Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $50,000,000 of DIP Loans subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party.  The Fronting Lender shall fund the Initial Draw **by no later than Wednesday, February 7, 2024 at 12:00 P.M. (Eastern Time)**.

(c)  In accordance with the terms of this Interim Order and the other DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under this Interim Order and the other DIP Documents, and in accordance with the Approved DIP Budget, subject to any Permitted Variance as set forth in this Interim Order and the other DIP Documents.  Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the

Debtors and approved by the Required DIP Lenders in accordance with section 5.01(c) of the DIP Credit Agreement (the "**Initial DIP Budget**").

(d)      In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to (i) the DIP Lenders and the DIP Agent under the DIP Documents, (ii) the Escrow Agent under the Escrow Agreement, and (iii) the Backstop Fee, Participation Fee, and Fronting Fee (each as defined in the DIP Credit Agreement)) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

      (1)      the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

      (2)      the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that are not material; *provided* that any such non-material amendment shall be provided to the U.S. Trustee and counsel for the Committee, to the extent one has been appointed at such time;

      (3)      the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents or the Motion, including (x) all premiums, fees, expenses and other amounts owed to the DIP Agent and the DIP Lenders (which premiums, fees and expenses, in each case, are deemed approved upon entry of this Interim Order), including,

without limitation, the Backstop Fee, Participation Fee, and Fronting Fee and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred or earned before or after the Petition Date, including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), Evercore Group L.L.C. (as investment bank and financial advisor), Berkeley Research Group, LLC (as financial advisor), Pachulski, Stang, Ziehl & Jones LLP (Attn: Laura Davis Jones) (as Delaware bankruptcy counsel), and any other specialty counsel and other professionals necessary to represent the interests of the DIP Lenders and the ad hoc group of the Prepetition Lenders (the "**DIP/First Lien Group**") in connection with the Cases (collectively, the "**DIP/First Lien Advisors**"); and (b) ArentFox Schiff LLP and their Delaware bankruptcy counsel, as counsel to the DIP Agent, and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in any jurisdictions reasonably required (collectively, the "**DIP Agent Advisors**"), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payments be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of Paragraph 19 of this Interim Order; and

(4)    the performance of all other acts required under or in connection with the DIP Documents, including, without limitation, pursuant to the Escrow Agreement.

(e)    Upon entry of this Interim Order and subject to the Fee Reserve Account and the Carve Out, the DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, and after any dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code

or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted to or on behalf of (a) the DIP Agent or any DIP Secured Parties or (b) the Prepetition Secured Parties, in each case, pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of the Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) and the "equities of the case" exception of section 552(b), in each case solely as to the Prepetition Secured Parties, subject to the entry of the Final Order). For the avoidance of doubt, and notwithstanding anything to the contrary in any Prepetition Loan Document, DIP Document, any additional document, instrument, certificate and/or agreement related to any of the foregoing, in no event shall any property, proceeds, cash, cash equivalents, or other property placed or held in the escrow account established pursuant to the Escrow Agreement at any time be, or be deemed to be, property of any of the Debtors, of any the Debtors' affiliates or subsidiaries, or of any of the Debtors' estates and the parties to the Escrow Agreement have acknowledged and agreed to the foregoing.

(f)     The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

4.      <u>Budget and Variance Reporting</u>.

(a)      On February 12, 2024 and on each subsequent Monday thereafter the Borrower will deliver to the Administrative Agent and the Lender Advisors a statement with the Debtors' Liquidity (as defined in the DIP Credit Agreement) as of the close of the previous Business Day.

(b)      On March 7, 2024 and on the Thursday of each fourth week thereafter (or more frequently if determined by the Debtors), the Debtors will deliver to the Administrative Agent and the DIP/First Lien Advisors an updated budget for the subsequent 13-week period (a "**Subsequent DIP Budget**"), which shall be in substantially the same form as the Initial DIP Budget.  Any Subsequent DIP Budget shall be deemed to constitute the "Approved DIP Budget" solely upon approval by the Required DIP Lenders (which must be in writing, email being sufficient) in their sole discretion; *provided*, that the Required DIP Lenders shall be deemed to have approved any Subsequent DIP Budget unless the Required DIP Lenders (or the DIP Agent acting at the direction of the Required DIP Lenders) have objected to such Subsequent DIP Budget within five (5) days after delivery of the same.  In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve such Subsequent DIP Budget as an "**Approved DIP Budget**."

(c)      Permitted Variances (defined below) shall be tested on February 22, 2024 and on the Thursday of each second week thereafter (each such date, a "**Testing Date**"), the Debtors shall deliver to the DIP Agent and the DIP/First Lien Advisors a budget

variance report/reconciliation in form reasonably satisfactory to the Required DIP Lenders

(the "**Approved DIP Budget Variance Report**"), setting forth in detail:

(1)     the Debtors' operating disbursments (the "**Actual Disbursements**") on a line-by-line and aggregate  basis for the two-week period ending on the Sunday preceding the applicable Testing Date (the "**Disbursements Testing Period**");

(2)     the Debtors' total receipts (collectively, the "**Actual Receipts**"), on a line-by-line and aggregate basis for the four-week period ending on the Sunday preceding the applicable Testing Date (the "**Receipts Testing Period**", and together with the Disbursements Testing Period, each a "**Testing Period**");

(3)     a comparison (whether positive or negative, in dollars and expressed as a percentage) of (1) the Actual Receipts (and each line item thereof) for the Receipts Testing Period to the amount of Debtors' projected cash receipts (and each line item thereof) and (2) the Actual Disbursements (and each line item thereof) for the Disbursements Testing Period to the amount of Debtors' projected disbursements (and each line item thereof), in each case, as set forth in the Approved DIP Budget for the applicable Testing Period; and

(4)     as to each variance contained in the Approved DIP Budget Variance Report, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.

(d)     The Debtors shall not permit on any Testing Date:

(1)     the Debtors' Actual Disbursements (excluding professional fees and debt service) during the Disbursement Testing Period (in the aggregate) to be more than 115% of the projected disbursements (excluding professional fees and debt service) for such period (in the aggregate as reflected in the "Total Operating Disbursements" line in the Approved DIP Budget) as set forth in the Approved DIP Budget; provided, that to the extent there is any unused variance capacity in any Disbursement Testing Period such amounts shall be permitted to roll-forward and be applied to offset Debtor's Actual Disbursements during the immediately following Disbursements Testing Period; and

(2)     the Debtors' Actual Receipts during the Receipts Testing Period (in the aggregate) to be less than 85% of the projected receipts (in the aggregate as reflect in the "Total Receipts" line in the Approved DIP Budget) for such period as set forth in the Approved DIP Budgets (the variances permitted by clauses (A) and (B), the "**Permitted Variances**").[4]

---

[4]   For the avoidance of doubt, all references in this Interim Order and the DIP Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Permitted Variances.

(e)     Concurrent with the delivery of any Subsequent DIP Budget, the Borrowers shall provide a forecast, by professional, of expected professional fee accruals corresponding to the same Testing Period as such Subsequent DIP Budget (the "**Professional Fee Forecast**").    The Professional Fee Forecast shall also contain the accruals (and cash disbursements) to each professional for the preceding four week period prior to the forecast; provided that if the preceding week is not available, then the accruals (and cash disbursements) should be for the last four-week that accruals (and cash disbursements) are available.  For the avoidance of doubt, the Professional Fee Forecast shall be inclusive of each professional that would be included in the "Professional Fees" line of any Approved DIP Budget.

(f)     The Debtors shall comply with the liquidity reporting and maintenance covenants set forth in Sections 5.01 and 6.14 of the DIP Credit Agreement.

5.     <u>Access to Records</u>.  The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.      <u>DIP Superpriority Claims</u>.  Subject only to the Fee Reserve Account and the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "**DIP Superpriority Claims**") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and, to the extent provided by the Bankruptcy Code, over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "**Avoidance Actions**").  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Cases.

7.      <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing

statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clauses (a) and (b) below being collectively referred to as the "**DIP Collateral**"), subject only to (x) Prior Senior Liens and (y) the Fee Reserve Account and the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):[5]

(a)    <u>First Priority Lien On Any Unencumbered Property</u>.  Subject only to the Fee Reserve Account and the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors (subject to certain exclusions as set forth in the DIP Credit Agreement), whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), a 100% pledge of equity interests in any direct or indirect  subsidiaries and all unencumbered assets of the Debtors; all prepetition property and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any

---

[5]    <u>Note</u>: Excluded Property concept to be addressed in DIP Credit Agreement.

accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; all patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, to the extent unencumbered as of Petition Date, the "**Previously Unencumbered Property**"); *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, that to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)      Liens Priming the Prepetition Liens.   Subject only to the Fee Reserve Account and the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, that to the extent a lien

cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)     <u>Liens Junior to Certain Other Liens</u>.  Subject only to the Fee Reserve Account and the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors that is encumbered by Prior Senior Liens, immediately junior to such Prior Senior Liens.

8.     <u>Adequate Protection for the Prepetition Secured Parties</u>.  Subject only to the Fee Reserve Account and the Carve Out, the DIP Obligations, and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any Diminution in Value resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Fee Reserve Account and the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Administrative Agents, for the benefit of themselves and the other Prepetition Secured Parties, are hereby granted the following (collectively, the "**First Lien Adequate Protection Obligations**"):

(a)     <u>First Lien Adequate Protection Liens</u>.   As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "**First Lien Adequate Protection Liens**"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control

agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Fee Reserve Account and the Carve Out, (B) the DIP Liens, and (C) Prior Senior Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)    Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "**Adequate Protection Superpriority Claims**"), but junior to the Fee Reserve Account and the Carve Out and the DIP Superpriority Claims.  Subject to the Fee Reserve Account and the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(c)    First Lien Adequate Protection Payments.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 19 of this Interim Order, all reasonable and documented fees and expenses

(the "**Adequate Protection Fees**"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to Paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, of (i) the DIP Agent Advisors; (ii) Freshfields Bruckhaus Deringer US LLP, 601 Lexington Avenue, New York, NY 10022 (Attn: Mark F. Liscio, Esq. and Scott D Talmadge, Esq.),  as counsel to the First Lien Administrative Agent; (iii) Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, IL 60602, as counsel to the Side-Car Prepetition Administrative Agent; and (iv) the DIP/First Lien Advisors (all payments referenced in this sentence, collectively, the "**Adequate Protection Payments**").  None of the Adequate Protection Fees shall be subject to separate approval by the Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)      Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately

protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

(e)     *Other Covenants*.    The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order.  The Debtors shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(f)     *Reporting Requirements*.  As additional adequate protection to the Prepetition Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement.

(g)     *Miscellaneous*.   Except for (i) the Fee Reserve Account and the Carve Out (ii) the DIP Liens and the DIP Obligations and (iii) as otherwise provided in this Paragraph 8, the First Lien Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition Secured Parties shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

9.     <u>Fee Reserve Account</u>.

(a)     As soon as reasonably practicable following entry of this Interim Order and following the delivery of a Statement (as defined below), the Debtors shall transfer first with cash on hand and, only if such sources are insufficient, with borrowings under the DIP

Facility, an amount equal to the total fees and expenses actually incurred or earned by persons or firms retained (or proposed to be retained) by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (such persons or firms, the "**Debtor Professionals**" and, such fees and expenses of the Debtor Professionals, the "**Professional Fees**") between the Petition Date and the end of the first weekly period set forth in the Approved DIP Budget as set forth on a written statement delivered to the DIP Agent and Lender Advisors at least one Business Day before any such transfer (each such statement, a "**Statement**"), which funds shall be deposited first into a segregated bank account at one of the Debtors' existing banks and then, once established by the Debtors or the Debtors' advisors, into a segregated account at a depository determined by the Debtors or the Debtors' advisors in their sole discretion, in each case not subject to the control, liens, security interests, or claims of the DIP Agent or any DIP Lender, other than the Reversionary Interest (as defined below) (in each case, such accounts, the "**Fee Reserve Account**"); *provided* that, the U.S. Trustee reserves its rights with respect to the location and amount of the Fee Reserve Account for compliance purposes pursuant to section 345 of the Bankruptcy Code. Thereafter, on a weekly basis, one Business Day following the delivery of a Statement, the Debtors shall transfer into the Fee Reserve Account first with cash on hand and, only if such sources are insufficient, with DIP Loan proceeds, an amount equal to the aggregate unpaid amount of the Professional Fees actually incurred or earned as of such date.

(b)     The Debtors shall be authorized to use funds held in the Fee Reserve Account to pay Professional Fees as they become allowed and payable pursuant to any interim or final order of this Court; provided that when all Allowed Professional Fees (as defined below) have been paid in full (regardless of when such Professional Fees are allowed by this Court) and the Carve Out (as defined below) is funded, any funds remaining in the Fee Reserve Account shall

revert to the Debtors for use solely in accordance with this Interim Order and the other DIP Documents and subject to the DIP Liens and DIP Superpriority Claims as set forth herein; *provided*, *further*, that the Debtors' obligations to pay allowed Professional Fees shall in no way be limited or deemed limited to funds held in the Fee Reserve Account.

(c)    Notwithstanding anything herein to the contrary, funds transferred to the Fee Reserve Account shall (i) be held in trust exclusively for the Professional Persons, including with respect to obligations arising out of the Carve Out, (ii) not be subject to any liens or claims granted to the DIP Agent or DIP Lenders herein and shall not constitute DIP Collateral, (iii) be treated as Cash and Cash Equivalents (as defined in the DIP Credit Agreement) under Section 4.03(k) of the DIP Credit Agreement, and (iv) be included in the calculation of Liquidity so long as no Event of Default exists under and as defined in the DIP Credit Agreement.

10.    <u>Carve Out</u>.  As used in this Order and the DIP Documents, the "Carve Out" shall be comprised of the following components:

(a)    <u>Clerk and U.S. Trustee Fees</u>.  All fees required to be paid to the Clerk of this Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code (collectively, "**Clerk and UST Fees**").

(b)    <u>Chapter 7 Trustee Fees</u>.  All reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Fee Cap**").

(c)    <u>Ombudsman Fees</u>.  All reasonable fees and expenses up to $100,000 incurred by any patient care ombudsman appointed in these chapter 11 cases (the "**Ombudsman Fee Cap**").

(d)    _Allowed Professional Fees_. To the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid Professional Fees (and upon allowance by this Court, the "**Allowed Professional Fees**") incurred or earned by the Professional Persons  (i) at any time before the date of the delivery of the Carve Out Trigger Notice, and without regard to whether such fees and expenses are provided for in the Approved DIP Budget, and (ii) at any time after the date of delivery of the Carve Out Trigger Notice in an aggregate amount not to exceed $4,750,000 (collectively, the "**Post-Trigger-Notice Carve Out Fee Cap**").  The Post-Trigger-Notice Carve Out Fee Cap shall not be reduced or increased by the amount of any compensation or reimbursement of expenses paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked.

(e)    _Carve Out Trigger Notice_. For purposes of this Interim Order, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, the Debtors' lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, and lead counsel to the Committee, which notice (i) may be delivered only upon the occurrence and during the continuation of an Event of Default (as defined below and subject to any applicable grace periods, waivers, or forbearances) and acceleration of the DIP Obligations under the DIP Credit Agreement and (ii) shall expressly state that the Carve Out is triggered and the Post-Trigger-Notice Carve Out Fee Cap has been invoked.

(f)    _Fee Reserve Account Funding After a Carve Out Trigger Notice_. On the day on which a Carve Out Trigger Notice is received by the Debtors (with a copy to lead counsel to the Committee), the Carve Out Trigger Notice shall constitute a demand to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to transfer the Fee Reserve Account cash in an amount equal to all remaining unfunded portions of the Carve Out as

provided herein to be held in trust to pay Allowed Professional Fees. Following delivery of a Carve Out Trigger Notice and the transfer set forth in the prior sentence, the DIP Agent shall deposit into the Fee Reserve Account any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Fee Reserve Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve Out as provided herein. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Obligors until the Fee Reserve Account has been fully funded in an amount equal to the Carve Out. Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Fee Reserve Account shall not constitute DIP Loans, (ii) the failure of the Fee Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Carve Out, Fee Reserve Account, or Approved DIP Budget or any of the foregoing be construed as a cap on the amount of the Professional Fees due and payable by the Debtors or that may be allowed by this Court at any time (whether by interim order, final order, or otherwise).

(g)     To the extent such cash on hand is not sufficient to fully fund the Fee Reserve Account, the Carve Out Trigger Notice shall be deemed to constitute a draw request by the Borrower to the Agent under the DIP Documents for DIP Loans (on a pro rata basis based on the then outstanding DIP Commitments) to fully fund the Fee Reserve Account, following delivery of the Carve Out Trigger Notice to the Debtors, notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of any default or Event of Default, or any termination of the DIP Commitments thereunder following an Event of Default. Any such funding

of the Fee Reserve Account shall be added to, and made part of, the DIP Obligations secured by the Collateral and shall otherwise be entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable nonbankruptcy law. Funds transferred to the Fee Reserve Account shall not (i) be subject to the DIP Liens, the DIP Superpriority Claims, or any claim, liens or security interests granted to any other party, (ii) constitute DIP Collateral or (iii) constitute Cash Collateral; *provided* that the DIP Agent (on behalf of the DIP Secured Parties) shall have a reversionary interest in the funds held in the Fee Reserve Account, if any, after all amounts included in the Carve Out, including any Allowed Professional Fees, have been paid in full pursuant to a final order of this Court (regardless of when such Professional Fees are allowed by this Court) (the "**Reversionary Interest**") and, to the extent such funds remain, such funds shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been Paid in Full (other than contingent indemnification obligations for which no claim has been asserted) and all DIP Commitments terminated. All funds in the Fee Reserve Account shall be used to pay the obligations set forth in the definition of the Carve Out until such obligations are paid in full. All payments and reimbursements made from the Fee Reserve Account after the delivery of a Carve Out Trigger Notice shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(h)    <u>Priority of Carve Out</u>.  The Carve Out shall be senior to the DIP Liens and the DIP Superpriority Claims.  Notwithstanding anything to the contrary contained in this Interim Order or any DIP Documents, the security interests, Liens and claims granted to any of the DIP Parties (including, without limitation, the DIP Liens and DIP Superpriority Claims) under, pursuant to or in connection with the DIP Facility, any DIP Document, or this Order, as applicable, shall be subject to payment in full in cash of the amounts due under the Carve Out.

(i)     Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been delivered in accordance with this Order: (i) the Debtors shall be permitted to pay Professional Fees, as the same may become due and payable, including on an interim basis, solely in accordance with orders of this Court, and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Trigger-Notice Carve Out Fee Cap.  None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred or earned in connection with these chapter 11 cases or any Successor Cases.  Nothing in this Order or otherwise shall be construed to obligate the DIP Agent or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

11.     <u>Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Secured Parties</u>.  Subject only to the Fee Reserve Account and the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the Fee Reserve Account and the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the other DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Documents, the Prepetition Loan Documents, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without

limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code solely in connection with the DIP Facility, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies.  For all adequate protection purposes throughout the Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date.  For the avoidance of doubt, such request will survive termination of this Interim Order.

12.     Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims.  Subject to the Challenge Period (defined below), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by

order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before seventy-five (75) calendar days after entry of the Interim Order, (the "**Challenge Period**" and, the date of expiration of the Challenge Period, the "**Challenge Period Termination Date**"); *provided* that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) calendar days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Administrative Agents and the Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "**Challenge**"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens

shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

13.     <u>Termination Date</u>. On the Termination Date (defined below), consistent with the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Fee Reserve Account shall be funded as set forth in this Interim Order; (b) all authority to use Cash Collateral shall cease; *provided* that during the Remedies Notice Period (defined below), the Debtors may use Cash Collateral solely to fund the Fee Reserve Account and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget, subject to any Permitted Variance provided for in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

14.     <u>Events of Default</u>.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "**Events of Default**"):   (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Required Milestones (defined below), or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

15.     <u>Milestones</u>.  The Debtors' failure to comply with those certain case milestones set forth in section 5.15 of the DIP Credit Agreement (collectively, the "**Required Milestones**") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement.

16.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order

from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may declare (email being sufficient) (any such declaration shall be referred to herein as a "**Termination Declaration**") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (b) subject to Paragraph 12(b), the DIP Agent (at the direction of the Required DIP Lenders) may declare (email being sufficient) a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the **"Termination Date"**). The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "**Remedies Notice Period**"): (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and this Interim Order with respect to the Debtors' use of Cash Collateral. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an

Event of Default has occurred or is continuing.  Except as set forth in this Paragraph 15 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order.  Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders), and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order; provided that the Prepetition Secured Parties shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

17.    <u>Limitation on Charging Expenses Against Collateral</u>.  No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Fee Reserve Account and the Carve Out), the DIP Agent, or the DIP Lenders or (b) subject to entry of the Final Order, the Prepetition Collateral (except to the extent of the Fee Reserve Account and the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the

DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

18.    <u>Use of Cash Collateral</u>.    The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement. Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

19.    <u>Expenses and Indemnification</u>.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement, participation, or commitment payments (including all payments and other amounts owed to the DIP Lenders), the Backstop Fee, the Participation Fee, the Fronting Fee, administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 3(d)(3)and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and

directed to pay on the Closing Date (as defined in the DIP Credit Agreement) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition Administrative Agents, and the DIP/First Lien Group, incurred or earned on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition Administrative Agents, or the DIP/First Lien Group to first deliver a copy of its invoice as provided for herein.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in Paragraphs 3(d)(3)and 8(c) of this Interim Order (collectively, the "**Lender Professionals**" and, each, a "**Lender Professional**") no later than ten (10) business days (the "**Review Period**") after the receipt by counsel for the Debtors, any Committee, or the U.S. Trustee of each of the invoices therefor (the "**Invoiced Fees**") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred or earned during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work

product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") if, within the Review Period, a Debtor, any Committee that may be appointed in these Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least five (5) calendar days prior written notice to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     In addition, the Debtors will indemnify each of the DIP Lenders, the DIP Agent, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each, an "**Indemnified Person**") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and out-of-pocket expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, willful misconduct, or willful breach of their obligations under the DIP Facility, which indemnity shall

have equal priority and lien status to the DIP Superpriority Claims.  In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; *provided*, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

20.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

21.    <u>Section 507(b) Reservation</u>.  Subject only to the Fee Reserve Account and the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

22.    <u>Insurance</u>.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

23.    <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Interim Order, the DIP

Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

    24.    <u>Perfection of the DIP Liens and First Lien Adequate Protection Liens</u>.

    (a)    The DIP Agent and the Prepetition Administrative Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent or the Prepetition Administrative Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order. If the DIP Agent or the Prepetition Administrative Agents (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition Administrative Agents (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

    (b)    A certified copy of this Interim Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition Administrative Agents in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*

that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the First Lien Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

25.    Release.  Subject to the rights and limitations set forth in Paragraph 12 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "**Related Parties**") and each of the Prepetition Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations,

rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, as applicable, including, without limitation:  (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.

26.     Credit Bidding.  The DIP Agent (at the direction of the Required DIP Lenders) and, subject to entry of the Final Order, the Prepetition Administrative Agents (at the direction of the Required Lenders (as respectively defined in each of the Prepetition Credit Agreements)) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

27. <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 24 herein.

(b)     In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)     Unless and until all DIP Obligations, Prepetition Obligations, and Adequate Protection Payments are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition Administrative Agents (respectively acting at the direction of the applicable Required Lenders), (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a

priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Fee Reserve Account and the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the First Lien Adequate Protection Liens or the Prepetition Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (iv) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases; *provided* that none of the foregoing shall require the Debtors to violate their fiduciary duties.

(d)     Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other

administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed

to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders).

(f)    Other than as set forth in this Interim Order, subject to the Fee Reserve Account and the Carve Out, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

28.    <u>Limitation on Use of DIP Facility Proceeds and DIP Collateral</u>.  Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Fee Reserve Account, or Carve Out or proceeds thereof may be used:   (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation,

for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Parties related to the DIP Obligations or the Prepetition Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders', the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition

Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Obligations or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate or prosecute, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations.

29.     Conditions Precedent.  Except as provided for in the Fee Reserve Account and Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

30.     Intercreditor Provisions. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (including in the First Lien Intercreditor Agreement) shall remain in full force and effect; *provided* that nothing in this Interim Order shall be deemed to provide liens to any Prepetition Secured Party on any assets of the Debtors except as set forth herein.

31.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; *provided* that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.    <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

33.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law.  The provisions set forth in this Paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34.    <u>No Requirement to File Claim for Prepetition Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without

limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition Administrative Agents nor any Prepetition Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Administrative Agents' or any Prepetition Lenders' rights, remedies, powers, or privileges under any of the Prepetition Loan Documents, this Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.    No Marshaling.  The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary and, subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

36.    Application of Proceeds of DIP Collateral.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

37.     <u>Equities of the Case</u>.  The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

38.     <u>Affiliate Transactions</u>.  Notwithstanding anything in the DIP Documents to the contrary, in no event shall any of the Debtors transfer any property to a non-Debtor affiliate without the consent of the Required DIP Lenders, except in the ordinary course of business or as authorized pursuant to an order of the Court.

39.     <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on _____, 2024, at__:___.m. (Eastern Time) and any objections or responses to entry of a final order on the Motion shall be in writing, filed with the Court, and served by no later than **4:00 p.m. (Eastern Time)** on _____, 2024 on the following:

a.  proposed attorneys for the Debtors: (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq. (gary.holtzer@weil.com), Jessica Liou, Esq. (jessica.liou@weil.com), Matthew P. Goren, Esq. (matthew.goren@weil.com), and Rachael Foust, Esq. (rachael.foust@weil.com)); and (ii) proposed co-counsel for the Debtors: Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: Michael J. Merchant, Esq. (merchant@RLF.com), and Amanda R. Steele, Esq. (steele@rlf.com));

b.  counsel to the DIP Agent:  ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor New York, NY 10019 (Attn: Jeffrey R. Gleit, Esq. (jeffrey.gleit@afslaw.com));

a.  ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor New York, NY 10019 (Attn: Jeffrey R. Gleit, Esq. (jeffrey.gleit@afslaw.com))

b.  counsel to the DIP Lenders and the DIP/First Lien Group: Gibson, Dunn & Crutcher LLP, 200 Park Ave, New York, NY 10166 (Attn: Scott J. Greenberg, Esq., Michael J. Cohen, Esq. and Christina M. Brown, Esq.);

c.  counsel to the Agent under the CS Credit Agreement: Freshfields Bruckhaus Deringer US LLP, 601 Lexington Avenue, New York, NY 10022 (Attn: Mark F. Liscio, Esq. and Scott D Talmadge, Esq.);

d.   counsel to the Agent under the Side-Car Credit Agreement: Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, IL 60602 (Attn: Evan Palenschat, Esq.);

e.   Indenture Trustee under the Senior Note Indenture: U.S. Bank National Association, West Side Flats 60 Livingston Ave. EP-MN-WS3C Saint Paul, MN 55107 (Attn: Global Corporate Trust Services); and

f.   the Office of the United States Trustee for the District of Delaware:  844 King Street, Suite 2207, Lockbox 35, Wilmington Delaware 19801 (Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov) and Jon Lipshie, Esq. (Jon.Lipshie@usdoj.gov)); and

g.   counsel to the Committee.

In the event no objections to entry of the Final Order on the Motion are timely received, the Court may enter such Final Order without need for the Final Hearing.

40.    _Effect of this Interim Order_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

41.    _Retention of Jurisdiction_.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

# EXHIBIT A

**DIP Credit Agreement**

**[To Come]**

## **EXHIBIT B**

**Budget**

| | Pre-Petition | Post Petition Weekly | | | | | | | | | | | | Pre-Petition | Post Petition | Forecast Total |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | 13 - Week |
| Week End | 2/4/24 | 2/11/24 | 2/18/24 | 2/25/24 | 3/3/24 | 3/10/24 | 3/17/24 | 3/24/24 | 3/31/24 | 4/7/24 | 4/14/24 | 4/21/24 | 4/28/24 | 2/4/24 | 4/28/24 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | |
| **Total Receipts** | 11.1 | 4.6 | 10.3 | 4.3 | 6.8 | 8.4 | 7.9 | 4.1 | 8.3 | 4.2 | 10.9 | 5.3 | 5.5 | 11.1 | 80.7 | 91.8 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Payroll & Benefits | (10.8) | (7.9) | – | (7.9) | – | (7.7) | (2.4) | (7.7) | – | (7.8) | – | (7.8) | – | (10.8) | (49.0) | (59.8) |
| Operating Disbursements | (5.7) | (4.3) | (2.5) | (4.4) | (3.4) | (3.4) | (2.4) | (2.4) | (3.4) | (2.4) | (2.4) | (2.4) | (2.4) | (5.7) | (35.7) | (41.4) |
| Provider Payments | (0.6) | (2.1) | (1.3) | (1.3) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.4) | (1.4) | (1.4) | (1.4) | (0.6) | (15.0) | (15.6) |
| Pharmacy Rx Costs | – | (1.0) | (1.0) | (1.0) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (1.0) | (1.0) | (1.0) | (1.0) | – | (10.5) | (10.5) |
| Rent | (2.1) | – | (0.1) | – | (2.3) | – | – | – | – | (2.3) | – | – | – | (2.1) | (4.7) | (6.8) |
| Ordinary Course Professionals | (2.0) | – | – | (0.4) | (0.4) | (0.6) | (0.6) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (2.0) | (4.4) | (6.5) |
| **Total Operating Disbursements** | (21.2) | (15.2) | (4.9) | (15.0) | (7.8) | (13.3) | (7.0) | (12.1) | (5.5) | (15.3) | (5.2) | (13.0) | (5.2) | (21.2) | (119.5) | (140.7) |
| **Non Operating Disbursements** | | | | | | | | | | | | | | | | |
| Debt Service & Fees | – | (0.2) | – | – | (0.7) | – | (0.3) | – | (1.7) | – | – | – | – | – | (2.9) | (2.9) |
| Professional Fees | (12.8) | (3.4) | – | – | – | – | (1.9) | – | – | – | – | (9.0) | – | (12.8) | (14.2) | (27.1) |
| **Total Non Operating Disbursements** | (12.8) | (3.6) | – | – | (0.7) | – | (2.2) | – | (1.7) | – | – | (9.0) | – | (12.8) | (17.1) | (29.9) |
| **Net Cash Flow** | (22.9) | (14.1) | 5.4 | (10.7) | (1.6) | (4.9) | (1.3) | (8.1) | 1.2 | (11.1) | 5.7 | (16.7) | 0.3 | (22.9) | (55.9) | (78.8) |
| Beginning Cash Balance | 25.2 | 2.3 | 38.2 | 43.6 | 32.9 | 31.3 | 26.3 | 25.0 | 39.9 | 41.1 | 30.0 | 35.7 | 39.0 | 25.2 | 2.3 | 25.2 |
| Net Cash Flow | (22.9) | (14.1) | 5.4 | (10.7) | (1.6) | (4.9) | (1.3) | (8.1) | 1.2 | (11.1) | 5.7 | (16.7) | 0.3 | (22.9) | (55.9) | (78.8) |
| DIP Borrowing / Paydown | – | 50.0 | – | – | – | – | – | 23.0 | – | – | – | 20.0 | – | – | 93.0 | 93.0 |
| Amortization | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Other | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Ending Cash Balance** | 2.3 | 38.2 | 43.6 | 32.9 | 31.3 | 26.3 | 25.0 | 39.9 | 41.1 | 30.0 | 35.7 | 39.0 | 39.4 | 2.3 | 39.4 | 39.4 |
| Beginning DIP Availability | – | 50.0 | – | – | – | 100.0 | 100.0 | 100.0 | 77.0 | 77.0 | 77.0 | 77.0 | 57.0 | – | 150.0 | 150.0 |
| (Borrowing) / Paydown | – | (50.0) | – | – | – | – | – | (23.0) | – | – | – | (20.0) | – | – | (93.0) | (93.0) |
| **Ending DIP Availability** | – | – | – | – | – | 100.0 | 100.0 | 77.0 | 77.0 | 77.0 | 77.0 | 57.0 | 57.0 | – | 57.0 | 57.0 |
| **Total Liquidity** | $ 2.3 | $ 38.2 | $ 43.6 | $ 32.9 | $ 31.3 | $ 126.3 | $ 125.0 | $ 116.9 | $ 118.1 | $ 107.0 | $ 112.7 | $ 96.0 | $ 96.4 | $ 2.3 | $ 96.4 | $ 96.4 |



1

**File a First Day Motion:**

[24-10164-KBO Cano Health, Inc.](#)

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: KBO | Case Flag: PlnDue, DsclsDue, MEGA, SEALEDMATRIX |

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Michael Joseph Merchant entered on 2/5/2024 at 12:29 PM EST and filed on 2/5/2024

| | |
|---|---|
| **Case Name:** | Cano Health, Inc. |
| **Case Number:** | [24-10164-KBO](#) |
| **Document Number:** | [16](#) |

**Docket Text:**
Motion to Approve Debtor In Possession Financing Filed By Cano Health, Inc. (Merchant, Michael)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**Cano - DIP Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=2/5/2024] [FileNumber=18417394-0]
[1f6c4c9bca00b8151d0b4bdb2d0fb1122c18df894d0ac9b85d9402e35d08867be667
93c5b2de940e903a4a5bd9cb0acefaa454d5d7fe2c84af5682303bc72f5f]]

**24-10164-KBO Notice will be electronically mailed to:**

Mark D. Collins on behalf of Debtor Cano Health, Inc.
rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

James McCauley on behalf of Debtor Cano Health, Inc.
mccauley@rlf.com, rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

Michael Joseph Merchant on behalf of Debtor Cano Health, Inc.
merchant@rlf.com, rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

Amanda R. Steele on behalf of Debtor Cano Health, Inc.
steele@rlf.com, rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

Alexander R. Steiger on behalf of Debtor Cano Health, Inc.
steiger@rlf.com, rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

U.S. Trustee
USTPRegion03.WL.ECF@USDOJ.GOV

**24-10164-KBO Notice will not be electronically mailed to:**