IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| In re | Chapter 11 |
| CANO HEALTH, INC., *et al.*, | Case No. 24–10164 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | Re: Docket No. 266 |

---

**DECLARATION OF CLAYTON GRING IN SUPPORT
OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a),
363, AND 503(c) AND FED. R. BANKR. P. 6004 FOR ENTRY
OF ORDER (I) AUTHORIZING DEBTORS TO PAY SEMI-ANNUAL
COMPENSATION OWED TO PHYSICIANS AND OTHER EMPLOYEE
HEALTH CARE PROVIDERS, AND (II) GRANTING RELATED RELIEF**

I, Clayton Gring, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge information, and belief:

1. I am a Partner and Managing Director at AlixPartners LLP ("**AlixPartners**"), a global independent restructuring consulting firm that specializes in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases. I have been employed by AlixPartners since 2016.

2. I received a Bachelor of Business Administration from Southern Methodist University and a Masters of Business Administration in from University of Texas. I have advised on several large-scale restructurings, including, among others, Fieldwood Energy, Phoenix

---

[1] The last four digits of Cano Health, Inc.'s tax identification number are 4224. A complete list of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/CanoHealth. The Debtors' mailing address is 9725 NW 117th Avenue, Miami, Florida 33178.

Services, Ditech Holdings, C&J Energy Services, Pacific Drilling, Refco, New Century and General Growth Properties. Prior to my time at AlixPartners, I served as Chief Financial Officer of a midstream oil & gas company in Midland, Texas. I have approximately 20 years of restructuring experience in providing both interim management and advisory services.

3. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) and Fed. R. Bankr. P. 6004 for Entry of Order (I) Authorizing Debtors to Pay Semi-Annual Compensation Owed to Physicians and Other Employee Health Care Providers, and (II) Granting Related Relief* (the "**Motion**"), filed contemporaneously herewith.[2]

4. AlixPartners has served as financial advisor to Cano Health, Inc. and certain of its subsidiaries (collectively, the "**Debtors**") since November 3, 2023. By order dated March 5, 2023 [Docket No. 256], the Court approved the Debtors' retention of AlixPartners, as financial advisor to the Debtors, in these chapter 11 cases. I am knowledgeable and generally familiar with the Debtors' day-to-day operations, books and records, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases. I am also familiar with the Debtors' compensation programs for their employees, including the Providers.

5. Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees and members of my team, my experience, knowledge, and information concerning the Debtors' operations and compensation programs within the health care and

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to the respective terms in the Motion.

wellness industries. If called upon to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtors.

6. Since the inception of their health and wellness businesses in 2017, the Debtors compensation structure for their physicians, nurse practitioners, physician assistants, and other health care providers (collectively, the "**Providers**") has included certain cash payments under the Provider Bonus Program as part of their normal, annual compensation based on various performance-based achievements, in an effort to reward individual or team efforts, promote productivity, and enhance Provider morale (the "**Provider Bonus Program**").

7. It is my understanding that the Provider Bonus Program has historically been part of the Debtors' overall compensation program for their Providers, and is generally included as part of their compensation in each Provider's employment contract. This program is performance driven, and was established to pursue several important objectives, including, among other things, (a) managing clinical performance and quality of care, (b) motivating Providers, (c) maintaining Provider compensation on par with compensation of similar medical practices, and (d) promoting patient care to ensure the best outcome of patient health.

8. I understand the utilization and quality metrics set each year under the Provider Bonus Program are used to ascribe a score to each Provider based on their clinical performance through the proactive management of patient care and include, but are not limited to, (a) the number of patients seen per day, (b) the number of new patients seen per day, (c) monitoring the number of emergency room visits to ensure patients have appropriate access outside of the acute care environment, (d) monitoring the number of hospital admissions to ensure patients are proactively receiving treatment to avoid unnecessary hospitalization, and (e) a generic dispensing rate to mitigate prescription of high cost branded drugs where generic options are available.

Regional physicians review the metric reports and inform the Providers of their metrics. Determination of the amounts to be paid to the Providers is typically made between 8–12 weeks after the close of the performance period: June or December, as applicable.  The amounts to be paid the Providers are initially reviewed by the regional physicians in partnership with operational leaders and the Debtors' Chief Operating Officer.  Final approval of the compensation awards under the Provider Bonus Program is determined by the Debtors' Chief Executive Officer in consultation with the Chief People Officer.

9. I understand that payments to Providers under the Provider Bonus Program have been paid semi-annually since 2021, with the payment for the first period, covering January through June, paid in September and the payment for the second period, covering July through December, paid the following April.  Since 2021, the total average annual aggregate payments under the Provider Bonus Program have been approximately $3,900,000 with an average aggregate semi-annual payment amount of approximately $2,000,000 (inclusive of the semi-annual amount requested by the Motion).  The target bonus for each Provider is typically set as either a percentage of the Provider's base salary (typically ranging from 5–10% of annual salary) or a set payment amount.  Those targets are then funded pro rata based on each Provider's achievement of the applicable metrics being measured for such Provider.

10. It is my understanding, based on my general knowledge of the health care and wellness industries and discussions with other professionals with knowledge of, and experience in, the health care and wellness industries, that incentive programs, such as the Provider Bonus Program, are commonplace in the primary care and medical industries.  Programs similar to the Provider Bonus Program are generally offered throughout the primary care and medical industries as a component of annual provider compensation and are offered to promote high levels

of patient care and superior clinical outcomes. I further understand that, throughout the health care and wellness industries, metrics for incentive programs, like the metrics for the Provider Bonus Program, are productivity-based with metrics similar to those used for the Provider Bonus Program.

11. For the period of July 1, 2023 through December 31, 2023, the amount of approximately $2,400,000 is due and owing to the Providers under the 2023 Provider Bonus Program. These amounts were fully earned by the Providers prior to the Petition Date and are due and owing to those employees as part of their regular and expected annual compensation. The average amount to be paid to any individual Provider is approximately $8,000. All of the Providers are W-2 employees who are employed by the Debtors as physicians, nurse practitioners, physician assistants, or other health care providers, and none of them is an "insider" as defined under section 101(31) of the Bankruptcy Code. Payments under the 2023 Provider Bonus Program are made only to Providers currently employed by the Debtors. Any Provider who resigns and works their last day prior to the disbursement of payment under the Provider Bonus Program will forfeit the payment. The amounts to be paid to the Providers pursuant to the Motion are included, and accounted for, under the Debtors' approved DIP Budget.

12. I believe it is a sound exercise of the Debtors' business judgment and in the ordinary course of business to make the remaining semi-annual payments due to the Providers under the 2023 Provider Bonus Program, and to continue the Provider Bonus Program in the Ordinary Course. These amounts were fully earned by the Providers prior to the Petition Date and the Providers rely upon payment of these amounts as part of their annual compensation. Failure to pay such amounts could result in loss of both morale and focus and would been seen as a lack of commitment by the Debtors to their Providers and other employees. Such distraction could lead

to a decline in the quality of patient care and disruption of the Debtors' businesses to the detriment of all of the Debtors' patients and stakeholders.  Failure to honor these commitments risks mass defections by the Providers, potentially to the Debtors' competitors, which could have a significant detrimental impact on value and jeopardize any chance of a successful reorganization in these chapter 11 cases.  For these reasons, I believe that paying the remaining prepetition amounts under the 2023 Provider Bonus Program, and continuing the Provider Bonus Program in the ordinary course, are in the best interests of the Debtors, their estates, and their economic stakeholders.

13. I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 5, 2024

*/s/ Clayton Gring*
Clayton Gring
Managing Director

*AlixPartners LLP*